909 So.2d 213 (2002)
Phillip Wayne TOMLIN
v.
STATE of Alabama.
CR-98-2126.
Court of Criminal Appeals of Alabama.
May 31, 2002.
Opinion Overruling Rehearing November 22, 2002.
*223 Bernard E. Harcourt, New York, New York, for appellant.
William H. Pryor, Jr., atty. gen., and James R. Houts and Kristi L. Deason, asst. attys. gen., for appellee.
McMILLAN, Presiding Judge.
The appellant, Phillip Wayne Tomlin, appeals his conviction for the intentional murders of Ricky Brune and Cheryl Moore, an offense punishable by death because two or more people were intentionally killed pursuant to one act or a series of acts. See § 13-11-2(a)(10), Ala.Code 1975, repealed.[1] Tomlin moved that the trial court accept the previously entered jury recommendation of 12-0 for life imprisonment without the possibility of parole. After a sentencing hearing before the trial court, the court ordered that Tomlin be sentenced to death by electrocution.
This case has a long and complicated procedural history. In 1978, Tomlin was tried and convicted for the double murder of Brune and Moore. This Court affirmed Tomlin's conviction but remanded the case for the trial court to correct its sentencing order. See Tomlin v. State, 443 So.2d 47 (Ala.Crim.App.1979). While Tomlin's case was pending on certiorari review in the Alabama Supreme Court, the United States Supreme Court released its decision in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The United States Supreme Court in Beck, held that the death-penalty statute under which Tomlin had been convicted was defective because it did not allow a jury to consider any lesser-included offenses. The Alabama Supreme Court ordered that Tomlin be retried based on Beck v. Alabama. Again, while the case was pending on application for rehearing in the Alabama Supreme Court, the United States Supreme Court released its decision in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). In Hopper, the Court held that because the defendant had admitted that he intentionally shot the victim there was no prejudice in the trial court's failure to instruct the jury on any lesser-included offenses. In light of the Court's decision in Hopper, the Alabama Supreme Court withdrew its order directing that Tomlin be granted a new trial and found no prejudice because Tomlin presented an alibi defense. Tomlin v. State, 443 So.2d 59 (Ala.1983). This Court thereafter affirmed Tomlin's conviction and sentence after the trial court corrected its written findings. Tomlin v. State, 516 So.2d 790 (Ala.Crim.App.1986). On second application for rehearing, the Alabama Supreme Court reversed Tomlin's conviction, finding plain error in the prosecutor's closing argument. The court found that the argument implied that the trial court believed that there was sufficient evidence to convict Tomlin. See Ex parte Tomlin, 540 So.2d 668 (Ala.1988).
In 1990, Tomlin was retried on the capital charges and again convicted. On appeal, this Court reversed Tomlin's conviction because of prosecutorial misconduct  the prosecutor presented evidence indicating that Tomlin's codefendant, John Daniels,[2] was awaiting execution on Alabama's death row. This Court also cited numerous *224 other instances that warranted a new trial. See Tomlin v. State, 591 So.2d 550 (Ala.Crim.App.1991).
In 1993, Tomlin was tried and convicted for the third time. This conviction was reversed because of juror misconduct  several jurors failed to disclose certain information during voir dire examination. See Tomlin v. State, 695 So.2d 157 (Ala. Crim.App.1996).
In 1999, Tomlin was tried for a fourth time and was convicted. It is from this fourth conviction and sentence of death that Tomlin now appeals.
The State's evidence has been detailed in the previous opinions of this Court. See Tomlin v. State, 443 So.2d 47, 516 So.2d 790, and 591 So.2d 550. The evidence presented at Tomlin's fourth trial did not vary in any great respect from the evidence presented at the other trials. The State's evidence tended to show that on January 2, 1977, Charles Castro and his wife reported to police that a body was lying next to a vehicle on the Theodore/Dawes exit ramp from I-10 in Mobile County. Police arrived at the scene and discovered 15-year-old Cheryl Moore lying beside the car and 19-year-old Richard Brune slumped behind the steering wheel. Both victims had been shot and had died as a result of multiple gunshot wounds. The wounds were made with a.38 caliber pistol and a 16-gauge shotgun. Brune had been shot four times with a .38 caliber weapon and Moore had been shot once with a .38 caliber weapon. All of the.38 caliber bullet wounds were inflicted by the same weapon. The toxicologist also testified that wadding recovered from Moore's body during the autopsy matched the 16-gauge shotgun shells recovered from John Daniels's apartment.
The evidence further showed that in 1975, approximately two years before the murders, Tomlin's brother, David Tomlin, had been killed in a shooting involving one of the victims, Ricky Brune. Evidence established that David Tomlin and Ricky Brune were employed at a furniture store as guards. Brune told police after the incident that a shotgun was knocked over and accidentally discharged fatally wounding David Tomlin. Tomlin's father told police that he did not believe that the shooting was an accident and that his family wanted Brune to be charged with murder. Tomlin's father wrote a letter to police that stated that if the police did not act within a certain period he would take "further action."
At the time of the murders Tomlin was living in Houston, Texas, with his wife and two children. Tomlin's wife was employed at a local bar called the Wet and Wild Club. About 10 months before the murders, a Texas Ranger was in the club and met with Tomlin. The ranger testified that Tomlin told him that he had to go to Mobile to take care of some family business; specifically, that he was going to kill the person who had murdered his younger brother. Another Texas Ranger overheard Tomlin's statements.
Tomlin's in-laws, Randy and Danny Shanks, also testified that Tomlin arrived in Mobile unexpectedly on the day before the murders. Randy Shanks testified that *225 Tomlin told them that he had flown from Houston, Texas, to New Orleans, Louisiana, and that he had driven from New Orleans to Mobile. Shanks said that Tomlin told them that he had come to avenge his brother's death  he said he had come to kill Ricky Brune. The Shankses testified that Tomlin was accompanied by John Daniels and that he asked the Shankses to get them a motel room. The Shankses took the two to a local motel where Randy Shanks filled out a registration card. Randy testified that when they got to the room, Tomlin and Daniels showed them a pistol and a sawed-off shotgun. He further testified that Tomlin referred to Daniels as a "hit man."
Other witnesses also testified that Tomlin was seen in Mobile on the day before and the day of the murders.
During the investigation, a Ford vehicle was found abandoned at the New Orleans International Airport. The vehicle was registered to Brenda Watson, Tomlin's sister. Police discovered a parking ticket dated January 2, 1977, at 8:08 p.m. inside the vehicle. An airport employee testified that a flight departed from New Orleans at approximately 8:40 p.m. on January 2, 1977, that was bound for Houston. This employee also testified that although Tomlin's name was not on the flight manifest, at that time a last-minute passenger could purchase a ticket for cash and his/her name would not appear on the manifest.
Mobile County Sheriff Deputy Warren Baker testified that he went to Houston during the investigation. He said that he arrested John Daniels and searched his apartment. Baker testified that he found a large bag with an airline sticker on the bag  the flight number matched the flight number of the flight that had left New Orleans on January 2. Baker also recovered a sawed-off shotgun in the trunk of Daniels's car.
Tomlin testified at his first trial. This testimony was read into evidence at Tomlin's fourth trial. Tomlin testified that he was in Houston at the time of the murders and that the Shankses had lied about his whereabouts because they did not like him.
The jury found Tomlin guilty of the double murder of Brune and Moore as charged in the indictment. On motion of the appellant, the parties stipulated to the jury's recommendation at the third trial  12-0 for life imprisonment without the possibility of parole. The trial court then held a sentencing hearing. Tomlin introduced numerous witnesses who testified about Tomlin's life since his incarceration. The witnesses included a prison guard on death row, a prison minister, and various friends and family members. Testimony was presented indicating that Tomlin was a model prisoner, that he had adapted well to life on death row, and that he was well liked by his fellow inmates and prison personnel. Tomlin's children also testified about the great impact that Tomlin had on their lives  each said that they spoke to Tomlin weekly. The trial court heard all the testimony and orally sentenced Tomlin to death at the end of the hearing. The trial court issued no formal written sentencing order. This appeal, which is automatic in a case where the death penalty has been imposed, followed. See § 13-11-5, Ala. Code 1975 (superseded; now § 13A-5-55).
On motion of the State, we directed the trial court to enter a written sentencing order that detailed the facts of the crime and the aggravating circumstances and the mitigating circumstances that it deemed were present in the case. The trial court complied with our order and submitted a written sentencing order that complies with the court's statutory obligation.

*226 Standard of Review

Tomlin has been sentenced to death. Pursuant to Rule 45A, Ala.R.App.P., which became effective on December 1, 1978, this Court is obliged to search the record for any plain error. Rule 45A, states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As we stated recently in Dorsey v. State, 881 So.2d 460, 473 (Ala.Crim.App.2001), quoting Hall v. State, 820 So.2d 113 (Ala. Crim.App.1999), aff'd, 820 So.2d 152 (Ala. 2001):
"`The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr. App.1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).'
"While the failure to object will not preclude this Court from reviewing an issue in this case, it will weigh against any claim of prejudice [Tomlin] makes on appeal. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."

Guilt-Phase Issues

I.
Tomlin argues that the trial court erred in denying his motion seeking to bar his further prosecution because, he said, it violated the Double Jeopardy Clause. Specifically, Tomlin argues that the prosecutor at both his 1978 and his 1993 trials committed such egregious misconduct that his convictions were reversed; therefore, he argues, because the prosecutor's conduct resulted in the prior reversals, any subsequent prosecution is barred based on United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Tomlin also argues that, once he raised the double jeopardy claim, the burden shifted to the State to prove that any subsequent prosecution was not barred based on the prosecutor's prior misconduct.
When arguing this issue at a pretrial motion hearing, the following occurred:
"[Defense counsel]: Basically, after a case has been reversed because of prosecutorial misconduct on a number of occasions, there comes a time when a case is a violation of double jeopardy. As I mentioned a number of times, the case was reversed in 1988 because of prosecutorial misconduct on the part of Don Valeska, comments on silence and comments on validity of the evidence. Those comments were so bad that the *227 Court held them to be plain error on the second petition for rehearing.
"The case was also reversed in 1991 for prosecutorial misconduct based on, again, a comment on silence and comment on the co-defendant being on death row and sentenced to death. There has been prosecutorial misconduct involved in the presentation of evidence that should have been excluded from the grand jury in 1993, and there also have been a panoply of improper comments to the media which are documented in Defendant's Exhibit Number One to the Court including comments to the Mobile paper that this is an absolute joke on the people of this state, as well as comments to the effect that the death penalty is too good for Tomlin.
"So when you put all these together, Your Honor, you have a situation of repeated acts of misconduct that give rise to a double jeopardy claim under cases like United States v. Dinitz, which is at 424 U.S. 600 in 1976, and United States v. [Jorn]. And basically the double jeopardy clause in the United States Constitution, and this is equally applicable to the States, is violated where, `bad faith conduct by judge or prosecutor threatens the (inaudible) by successive prosecutions and declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict the Defendant.'
"After a while, Your Honor, prosecution is barred by double jeopardy."
This issue has been previously addressed by this Court in the opinion on appeal from Tomlin's third trial and conviction. In that opinion we stated:
"The principle of double jeopardy that [most] closely resembles Tomlin's argument is set out in United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), as follows:
"`The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor," United States v. Jorn, [400 U.S. 470,] 485, 91 S.Ct. [547,] 557[, 27 L.Ed.2d 543 (1971)], threatens the "[h]arassment of an accused by successive prosecutions or the declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. Downum v. United States, [372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963)].'
"424 U.S. at 611, 96 S.Ct. at 1081, 47 L.Ed.2d at 276 (emphasis added). The gravamen of this principle is that the courts will not allow a prosecutor to circumvent the Double Jeopardy Clause by goading a defendant into nullifying a proceeding by seeking a mistrial, thus resulting in a new trial at a later date. Oregon v. Kennedy, [456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)], clarified the narrow test to be applied in determining whether a prosecutor's misconduct bars a defendant's retrial on double jeopardy principles:
"`Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on the defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.'
"456 U.S. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 424 (emphasis added).

*228 "Although Tomlin relies solely on the Dinitz line of cases, this principle clearly does not support Tomlin's position. Likewise, the rule in Dinitz does not apply to the facts of this case  either as presented by Tomlin, or as independently gleaned from the record. Tomlin contends only that the prosecutor's habitual misconduct was reckless and that it had the incidental effect of subjecting Tomlin to a Sisyphean crucible. On this point, we agree; however, we know of no double jeopardy principle that forbids successive trials resulting from clumsy prosecutions. See Morrison v. Missouri, 946 F.2d 1340, 1343 (8th Cir. 1991), cert. denied, 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992) (`over-reaching, harassing, intentional and bad faith conduct' does not implicate double jeopardy unless `the prosecutor's conduct was "intended to provoke the defendant into moving for a mistrial." [Oregon v.] Kennedy, 456 U.S. at 679, 102 S.Ct. at 2091[, 72 L.Ed.2d at 427]'). Tomlin has not alleged that the prosecutor intentionally invited reversal at Tomlin's previous trials, and we have reviewed the record and have found absolutely no facts to support such an allegation. We hold that the trial court's summary denial of Tomlin's motion was proper. Even if all of the factual allegations contained in Tomlin's motion were taken as true, Tomlin would not be entitled to relief."
695 So.2d at 164-65 (footnote omitted). See also Spears v. State, 647 So.2d 15 (Ala.Crim.App.1994) (no double jeopardy bar to retrial when the prosecutor violated the trial court's "gag" order and several newspapers articles appeared in the local paper during the trial thereby causing the trial court to declare a mistrial); Robinson v. State, 405 So.2d 1328, 1332 (Ala.Crim. App.), cert. denied, 405 So.2d 1334 (Ala. 1981) ("no double jeopardy impediment to appellant's retrial on the basis of the prosecution's alleged knowing use of perjured testimony at the first trial").
Moreover, the State did not have the burden of proof here. In Spears, we addressed this identical issue and stated:
"Here, the appellant has simply failed to carry his burden of proof on this issue. `"Since a plea of former jeopardy sets up affirmative matter . . ., the burden of proving this issue, from the start, is on the defendant...." 30 Am. Jur.2d Evidence § 1160 (1967).' Morris v. State, 465 So.2d 1173, 1177 (Ala.Cr. App.1984), reversed on other grounds, 465 So.2d 1180 (Ala.1985)."
Spears, 647 So.2d at 24. Tomlin failed to meet his burden of proving that his subsequent retrial was barred based on a violation of the Double Jeopardy Clause.

II.
Tomlin argues that the prosecutor engaged in misconduct when he abused the grand-jury process. Specifically, Tomlin argues that the prosecutor presented evidence to the grand jury to secure a two-count indictment charging double murder and murder for hire, the latter of which Tomlin had been acquitted of as a result of the verdict in his second trial. Tomlin contends that the prosecutor's actions in presenting such evidence prejudiced him and violated his constitutional rights.
This same issue was presented on the appeal from Tomlin's third trial and conviction. This Court stated:
"Tomlin contends that the prosecutor improperly manipulated the grand jury in the current proceedings by presenting to it evidence relating to the murder-for-hire charge, as to which he had been acquitted in the second trial. Tomlin claims that as a result, the grand jury was prejudiced against him and was improperly *229 induced to charge him with double murder  a charge that it would, allegedly, not have otherwise returned. Because, as we have previously noted, the grand jury found probable cause to indict Tomlin for murder-for-hire, we presume that the prosecutor presented to the grand jury evidence of an alleged contract. However, the record before us contains none of the evidence presented to the grand jury. Thus, for purposes of our discussion of this issue, we assume that the evidence relevant to a murder-for-hire charge that was presented to the grand jury was the same subsequently presented to the petit jury: (1) that Tomlin referred to Daniels as a `hit man,' and (2) that Tomlin stated that he hired Daniels to kill the victims.
"Tomlin has failed to present anything in the record that would indicate that the prosecutor did not present sufficient evidence to the grand jury on the charge of double murder.
"`"When it appears that witnesses were examined by the grand jury, or that the grand jury had before them documentary evidence, no inquiry into the sufficiency of the evidence is indulged." Loyd v. State, 279 Ala. 447, 448, 186 So.2d 731 (1966).'

"Coral v. State, 551 So.2d 1181, 1182 (Ala.Cr.App.1989). It appears in this case that the grand jury did examine witnesses and [documents]; therefore, we will not address whether that evidence was sufficient to support the grand jury's return of the double murder indictment.
"Tomlin's argument is merely that the grand jury considered illegal, prejudicial evidence. However,
"`[w]hile an indictment cannot rest "solely" on [illegal] evidence ..., Alsobrook v. Bridges, 43 Ala.App. 145, 146, 182 So.2d 382 (1966), the fact that illegal evidence was considered by the grand jury along with legal evidence does not render the indictment void or subject to being quashed. Aaron v. State, 271 Ala. 70, 77, 122 So.2d 360 (1960).'

"Coral, 551 So.2d at 1182. Furthermore, all evidence that would have supported a charge that Tomlin contracted the murders was also relevant to the issue whether Tomlin intentionally caused the deaths of the victims and was in the form of admissible hearsay testimony. Therefore, without question, this evidence was admissible in regard to the double murder charge.
"Tomlin's argument is thus reduced to the mere claim that evidence presented to the grand jury was prejudicial. This contention is axiomatic and does not, without more, render that evidence inadmissible. Cf., Oregon v. Kennedy, 456 U.S. 667, 675, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416, 424 (1982) (`Every act on the part of a rational prosecutor during a trial is designed to "prejudice" the defendant by placing before the judge or jury evidence leading to a finding of guilt.'). Based upon the record on appeal, the prosecution did not place Tomlin twice in jeopardy on the charge of murder-for-hire, and the trial court properly allowed the trial to proceed under the indictment that charged him with double murder."
695 So.2d at 163-64 (footnote omitted).

III.
Tomlin argues that the extent of the pre-trial publicity surrounding the case created an atmosphere of prejudice and resulted in his being denied a fair and impartial trial. Specifically, Tomlin contends that the community was saturated with negative publicity surrounding the *230 facts of the case and the procedural posture of the case  specifically, that this was Tomlin's fourth trial on the capital-murder charges.
The majority of Tomlin's argument in his brief to this Court on this issue is devoted to attacking the number of articles published and the extent of the prospective jurors' knowledge of the case before Tomlin's 1993 trial. It is not disputed that the publicity surrounding this case was extensive. However, the majority of the articles were written in 1977, immediately after the murders, and again immediately before Tomlin's 1993 trial.
During the hearing on the motion for a change of venue, the trial court stated:
"The Court: ... I have no idea what [the newspaper] will print, what they will not print. I'm not inclined at this time to grant the motion for a change of venue. I do think some serious concerns and issues have been raised, and the Court is aware of those issues, and the Court will keep those issues in mind throughout these proceedings, but I'm not going to grant a change of venue.
"I will state for the record, though, unless there is a need to hear argument on this or there is a strong objection from either side, I am going to request  no, I'm going to order that there are no interviews by the State or Defense with the local [newspaper]. I think that would only aggravate the situation, cause additional problems and then  knowing how the media may or may not take that, and it's not only limited to the Mobile Register but any electronic media or print media.
"The intent at this point is to make sure that the State and the Defense receive a fair and impartial trial, and nothing is to be gained by giving any interviews, in my opinion, to any media outlet, either in Mobile or any part of this state. I think it just would aggravate the situation.
"I am also inclined to deviate from my normal jury selection process if there's a request from either side to initially start out with individual voir dire so as to ensure that we don't taint the panel and have to have a motion or hearing after we start the proceedings, and I'm not happy about that because that's a very tedious process, a very long process and, actually, it will take longer than the actual trial. But just out of an abundance of caution I think that may be appropriate so we will not be back here again. And at the appropriate time if either side is going to make that request, you know the Court's feeling on that."
The trial court then denied the motion.
The record reflects that 75 people were summoned for the jury venire in this case. The venire was questioned as a group concerning general background information. The group was then split into 5 panels of 15 members. The panels were questioned about whether the members had any prior knowledge of the case. Any member of the panel who responded affirmatively was questioned individually about what knowledge he or she had about the case and whether that knowledge would affect the person's ability to render an impartial verdict. In panel one, three prospective jurors indicated that they had heard about the case. One indicated that she had read about the case in the newspaper about two months before the trial and that she could not remember any details about the case. Another juror in panel one indicated that at the time of the offense she vaguely remembered hearing about the case. The third juror indicated that he had heard two people talking about the case at the courthouse. All were questioned individually, and each indicated that *231 he or she could set aside any knowledge about the case and render a decision based on the evidence presented at the trial. In panel two, three prospective jurors indicated that they had read about the case in the newspaper. All indicated that they could not remember any details. In panel three, three prospective jurors indicated that they had heard something about the case. All could remember no specifics, just a vague recollection. It appears that panel four and five were questioned as a group because of the lateness of the hour. In this group only one prospective juror indicated that he remembered vaguely hearing about the case. All of the jurors indicated that they could be impartial and that any knowledge they had about the case would not affect their ability to be impartial.
The record also indicates that the court adjourned for the day before the petit jury was struck. The trial court gave the prospective jurors a very thorough instruction that they were not to watch television, read a newspaper, or discuss the case. The next morning, defense counsel introduced a newspaper article that had appeared in a local newspaper that same morning. The trial court stated that it would ask the jurors if they had followed its instructions by not reading the newspapers or listening to the news. No juror indicated that he or she had failed to follow the trial court's instructions. The court once again denied the motion for a change of venue.
A review of the voir dire proceedings indicates that this is not a case where the area was so saturated with pretrial publicity that Tomlin was unable to obtain a fair trial. It is clear, after reviewing the voir dire examination, that very few of the 75 veniremembers indicated that they had any prior knowledge of the case. It is also clear that the passage of time in this case between the murders and the fourth trial, approximately 22 years, resulted in the prospective jurors' remembering very little about the facts and the circumstances surrounding the murders.
We have stated:
"`Media publicity can prejudice prospective jurors and thereby result in a denial of a defendant's right to a impartial jury. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). In order to get a change of venue based on pretrial publicity, the defendant must prove that there existed actual prejudice against the defendant as a result of the publicity or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Newspaper articles or widespread publicity, without more, is insufficient to grant a motion for a change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978).
"`Our review of the voir dire examination concerning pretrial publicity indicates that, while many veniremembers had heard something about the case from the media, there were no grounds to warrant a change of venue. See Stewart v. State, 730 So.2d 1203, 1241 (Ala.Cr.App.1996).'
"Also, in Williams v. State, 565 So.2d 1233, 1237-38 (Ala.Crim.App.1990), we stated:
"`"As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *232 It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"`"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)."
"`Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 [(1985)].'"
Dorsey, 881 So.2d at 480. It is abundantly clear after reading the voir dire examination of the prospective jurors that the trial court committed no error in denying Tomlin's motion for a change of venue.

IV.
Tomlin argues that the trial court erred in failing to allow individual sequestered voir dire of the prospective jurors, in violation of his right to a fair trial and an impartial jury.
Here, the trial court did not allow individual sequestered voir dire of all of the 75 prospective jurors. The trial court allowed voir dire in panels of 15. It appears from the record that the last two panels were questioned as a group. Moreover, the jurors had already filled out extensive juror questionnaires. The trial court allowed individual voir dire of those prospective jurors who indicated that they had prior knowledge about the case. At times, other questions were also asked of these jurors.
This Court has repeatedly upheld the denial of individual voir dire in capital cases. See Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001); Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000), cert. denied, 795 So.2d 842 (Ala.2001); Woods v. State, 789 So.2d 896 (Ala.Crim. App.1999), aff'd, 789 So.2d 941 (Ala.2001); Whitehead v. State, 777 So.2d 781 (Ala. Crim.App.1999), aff'd, 777 So.2d 854 (Ala. 2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Hammonds v. State, 777 So.2d 750 (Ala.Crim.App. 1999), aff'd, 777 So.2d 777 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Merrill v. State, 741 So.2d 1099 (Ala.Crim.App.1997).
There is no indication that the method used by the trial court to question prospective jurors prejudiced Tomlin. Tomlin argues in his brief that he was prejudiced by the method, but he cites no specific instance indicating how. Indeed the voir dire of the jurors does not support any showing of prejudice as to the method used in questioning the prospective jurors.
Tomlin also argues that the trial court erred in allowing the jurors to be questioned about their views regarding the death penalty. He contends that because the jury was to have no role in sentencing, the jurors should not have been asked any questions about the death penalty.
We have reviewed the voir dire examination. The jurors were not death-qualified within the meaning of the Supreme Court's decision in Witherspoon v. *233 Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Indeed, Tomlin has pointed to no question asked of the prospective jurors concerning their views regarding the death penalty and whether they could vote to impose the death penalty. Here, the trial court asked each panel if the fact that the punishment carried the possibility of the death penalty would effect the jurors' ability to determine Tomlin's guilt or innocence. This was a permissible question. "In a capital case, the conduct of the voir dire examination of the jury venire is a matter within the discretion of the trial court." Taylor, 808 So.2d at 1184. No error occurred here.

V.
Tomlin argues that the trial court erred in allowing the jurors to be housed in the same hotel as the prosecutor and the witnesses for the State.
The following occurred when this issue was discussed before the trial:
"[Defense counsel]: And did the Court find out anything with regard to housing of the jurors and all of those issues that we talked about?
"The Court: Okay. Judge Kendall [then the presiding judge of the Mobile County Circuit Court] was not in this morning when I got in and then when he came in, I was on the bench, so I have not spoken to him to make arrangements. What I'm going to do is I'm just going to make arrangements with the hotel to make sure that those attorneys and witnesses are housed, at least, two floors separate from the jury and then I will make sure I give instructions to the sheriff's department to make sure that  the jurors are not allowed to be outside of the presence of a deputy at any time and we'll make sure that happens.
"[Defense counsel]: And Your Honor, will just note our continuing objection?
"The Court: Noted for the record.
"[Defense counsel]: Thank you, Your Honor.
"The Court: And with  and if you want to, each day, we can question the officers to make sure that they have complied with my order, just for safeguard."
Defense counsel did not object to the trial court's method of handling this situation. This issue was not raised again at trial.
There is no indication that Tomlin was prejudiced by the accommodations made for the jurors, who were sequestered. Tomlin makes no argument in his appellate brief that any unauthorized contact occurred between the jurors, the prosecutors, or any witnesses. Indeed, there is no indication in the record of any unauthorized contact. The trial court has great discretion in determining matters of court scheduling and court procedures. See Ephraim v. State, 627 So.2d 1102, 1105 (Ala.Crim.App.1993). There was no abuse of that discretion here.

VI.
Tomlin argues that the trial court erred in failing to grant several of his challenges for cause.
When reviewing whether a trial court has erred in denying a challenge for cause, we apply the following standard of review:
"A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). To justify a challenge for cause there must be a statutory bias or some matter that imports absolute bias or favor and leaves nothing to the discretion of the *234 trial court. Pardue v. State, 571 So.2d 320 (Ala.Cr.App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990); Minshew v. State, 542 So.2d 307 (Ala. Cir. App.1988). Even proof that the veniremember is biased or has a fixed opinion is insufficient. There must be proof that the opinion was so fixed that it would bias the verdict of the veniremember. Clark v. State, 443 So.2d 1287 (Ala.Cr. App.1983). If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State, Mahan v. State, 508 So.2d 1180 (Ala.Cr. App.1986)."
Smith v. State, 698 So.2d 189, 200 (Ala. Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). "`The test for determining whether a strike rises to the level of a challenge for cause is "whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and evidence."'" Baker v. State, 906 So.2d 210, 254 (Ala.Crim.App. 2001) (quoting Dunning v. State, 659 So.2d 995, 997 (Ala. Crim.App.1994)).
Initially, we observe that none of the challenged jurors served on Tomlin's jury. Tomlin removed them using peremptory strikes.

A.
Tomlin argues that the trial court erred in failing to grant his motion to remove prospective juror B.L.[3] for cause. Specifically, he argues that B.L. was married to a Prichard police officer who was the former partner of Capt. Bud Henton, a witness for the State. He contends that we should presume bias based on this juror's connection to Capt. Henton. Tomlin cites Ex parte Tucker, 454 So.2d 552 (Ala. 1984), in support of this argument.
Initially, we note that the record reflects that B.L. stated during voir dire that she was the ex-wife of a retired police captain in the Prichard Police Department. The following occurred during the voir dire of B.L.:
"[Defense counsel]: Would you mind telling us just how well did you know him [Capt. Henton], how long did you know him?
"[B.L.]: Well, I haven't seen him in over 30 years.
"[Defense counsel]: Okay.
"[B.L.]: So, maybe, 40 years 
"[Defense counsel]: Okay.
"[B.L.]:  but at one time, I think, Bud was the  my husband  ex-husband's partner.
"[Defense counsel]: Oh, he was?
"[B.L.]: So I used to see him quite often.
"[Defense counsel]: Okay. And was your ex-husband  then he was an officer with the Prichard Police Department.
"[B.L.]: Yes, he retired as captain with the Prichard Police Department. Most of the people would have known him.
"[Defense counsel]: Okay. And so the 
"[B.L.]: Rufus Harbin was his brother and he was a captain with the County and Joe Harbin was the lieutenant with the City of Prichard.
"[Defense counsel]: Do you think if these folks that you know so well were testifying  not all of these folks, but just Mr.  I guess the only one that would testify would be Mr. Henton  that since you know him and have a relationship with him outside of court, do you think that would  you might 

*235 "[B.L.]: No, I haven't seen Bud in years so 
"[Defense counsel]: And you think the passage of these 30 years, everything would be fine?
"[B.L.]: Yes.
"[Defense counsel]: And you could treat him just like any other witness, not give any more credibility, not any less credibility?
"[B.L.]: Right.
"[Defense counsel]: Thank you, ma'am."
In order to successfully challenge a prospective juror for cause, the basis for the challenge must be a statutory ground under § 12-16-150, Ala.Code 1975, or a matter that imports absolute bias and leaves nothing to the discretion of the trial court. See Dorsey, supra.
In Ex parte Tucker, supra, the case cited by Tomlin in his brief to this Court, the Alabama Supreme Court reversed the conviction because of prosecutorial misconduct. The Court then stated:
"On a second point, we note that during the qualification of the venire, it was discovered that a potential venireman. . . was the brother of a witness for the State. Counsel for petitioner challenged the venireman for cause, stating, `He is the brother of perhaps the most material witness in the entire case.' The trial judge denied the challenge. To do so was reversible error. Nobis v. State, 401 So.2d 191 (Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala.1981)."
Tucker, 454 So.2d at 553. The above quote is the extent of the Court's discussion on this issue in Tucker. Clearly, the situation presented in this case did not rise to the level denounced in Tucker. Here, B.L. was the ex-wife of a former Prichard police captain who had been the former partner of a State's witness. B.L. was not related by blood or marriage to a State's witness. B.L. also said that she had not seen the witness in over 30 years. Moreover, B.L. stated that her former association with Henton would not effect her ability to be impartial.
Tomlin further argues that we should presume bias based on B.L.'s former relationship and that we should find the circumstances sufficient to amount to a common-law reason to remove B.L. for cause.
In addition to the statutory grounds for removing a juror for cause contained in § 12-16-150,[4] Alabama courts have also recognized that there may still be a common-law basis for removing a *236 juror for cause. See Hutchins v. DCH Reg'l Med. Ctr., 770 So.2d 49 (Ala.2000); CSX Transp., Inc. v. Dansby, 659 So.2d 35 (Ala.1995). In Beasley v. State, 39 Ala. App. 182, 96 So.2d 693 (1957), the court discussed the common-law grounds for a challenge for cause and stated:
"`..."At common law the grounds for challenge were classified under four heads, as follows: (1) propter honoris respectum; as, if a lord of Parliament be impaneled on a jury, he may be challenged by either party, or he may challenge himself; (2) propter defectum; as if a juryman be an alien born, this is defect of birth; (3) propter affectum, as for suspicion of bias or partiality  this may be either a principal challenge, or to the favor; (4) challenges propter delictum are for some misdemeanor or crime which affects the juror's credit and renders him infamous, as for conviction of treason, felony, perjury, or conspiracy. A challenge propter affectum is of two kinds: a challenge to the favor and for principal cause." 16 R.C.L. 254. The common-law grounds as far as applicable to our system and not changed by statute remain for our guidance. Our statute has added certain grounds of challenge for cause, but they are not exclusive of the common law remaining unchanged. ...' ... See also dictum in Wyatt v. State, 36 Ala.App. 125, 57 So.2d 350."
39 Ala.App. at 185, 96 So.2d at 696, quoting Brown v. Woolverton, 219 Ala. 112, 121 So. 404, 406 (1928) (Emphasis in original.)
"[W]here a common law ground is involved, there must either be some matter which imports absolute bias or favor and leaves nothing for the discretion of the court or a situation which presents a mixed question of law and fact to be determined by the trial court in its sound discretion."
Mullis v. State, 258 Ala. 309, 312, 62 So.2d 451, 453 (1952).
"`A challenge for favor or bias is to be determined by the trial court as any other question of fact, tried without a jury, and is reviewable on like principles. 35 Corpus Juris, 312, 403, 404; 16 R.C.L. 279, 282, 288; Calhoun v. Hannan, 87 Ala. 277, 6 So. 291 [(1889)]; Larkin v. Baty, 111 Ala. 303, 307, 18 So. 666 [(1895)]. The decision of the trial court on such question founded on oral evidence is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion. 35 Corpus Juris, 404, 405; 16 R.C.L. 289.'"
Felton v. State, 46 Ala.App. 579, 584, 246 So.2d 467, 471 (Crim.1971), quoting Brown v. Woolverton, 121 So. at 406.
"`Our Supreme Court has held that "[n]o right of an accused felon is more basic than the right to `strike' a petit [jury] from a panel of fair-minded, impartial prospective jurors." Ex parte Beam, 512 So.2d 723, 724 (Ala.1987). The propriety of a trial court's ruling in the challenge of a venireperson for cause based on bias must be measured against a defendant's constitutional right to a fair trial. Ex parte Beam, U.S. Const. Amends. VI, XIV. The qualification of a prospective juror is a matter within the discretion of the trial court, and a trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of abuse of that discretion. Ex parte Rutledge, 523 So.2d 1118 (Ala.1988). An appellate court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. Knop v. [McCain], 561 So.2d 229 (Ala.1989). "Ultimately, the test to be applied is *237 whether the juror can set aside [his or] her opinions and try the case fairly and impartially, according to the law and the evidence." Id. at 232. "[A] prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence." Id. See also Fordham v. State, 513 So.2d 31 (Ala.Cr. App.1986).'"
England v. State, 601 So.2d 1108, 1109 (Ala.Crim.App.1992), quoting Hunter v. State, 585 So.2d 220, 221-22 (Ala.Crim. App.1991).
B.L.'s answers to the voir dire questions clearly indicated that she was not so biased that the trial court had no discretion but to grant a challenge for cause. Therefore, there was also no common-law reason to remove B.L. for cause.
Moreover, B.L. was removed by the defense's use of one of its peremptory strikes. The United States Supreme Court in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), held that as long as the selected jury was impartial there was no prejudicial error when a trial court failed to remove a juror for cause who was subsequently removed by the defense using a peremptory challenge. The Martinez-Salazar Court stated:
"In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. See, e.g., J.E.B. [v. Alabama ex rel. T.B.], 511 U.S. [127], at 137, n. 8 [(1994)] (purpose of peremptory challenges `"is to permit litigants to assist the government in the selection of an impartial trier of fact"') (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991)); Georgia v. McCollum, 505 U.S. 42, 57 (1992) (peremptory challenges are `one state-created means to the constitutional end of an impartial jury and a fair trial'); Frazier v. United States, 335 U.S. 497, 505 (1948) (`the right [to peremptory challenges] is given in aid of the party's interest to secure a fair and impartial jury'). Moreover, the immediate choice Martinez-Salazar confronted  to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error  comports with the reality of the jury selection process. Challenges for cause and rulings upon them, as Judge Rymer observed, see supra, at 310, are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, `by the minute.' [United States v. Martinez-Salazar,] 146 F.3d [653] at 661 [(9th Cir.1998)].
"....
"We answer today the question left open in Ross [v. Oklahoma, 487 U.S. 81 (1988)] and hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause. Martinez-Salazar and his codefendant were accorded 11 peremptory challenges, the exact number Rule 24(b) and (c) allowed in this case. Martinez-Salazar received precisely what federal law provided; he cannot tenably assert any *238 violation of his Fifth Amendment right to due process. See Ross, 487 U.S. at 91."
528 U.S. at 315-17, 120 S.Ct. 774. The Alabama Supreme Court has relied on the United States Supreme Court's decision in Martinez-Salazar to affirm a trial court's erroneous grant of a challenge for cause. In Evans v. State, 794 So.2d 411, 414 (Ala.2000), the Alabama Supreme Court stated:
"Evans argues that the trial court's error in excusing E.F.W. violated his right to a trial by an impartial jury, a right guaranteed by Amendments 6 and 14 of the United States Constitution and § 6 of the Alabama Constitution. However, the United States Supreme Court has held that a defendant's federal right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause. Ross v. Oklahoma, 487 U.S. 81, 87-88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); see also United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). As long as the jury that heard the case was impartial, the right guaranteed by the United States Constitution was not violated. See Ross, 487 U.S. at 87-88, 108 S.Ct. 2273. This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial `by an impartial jury of the county or district in which the offense was committed.' The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6.
"Evans has made no showing that his rights, such as his right to an impartial jury, were probably injuriously affected by the trail court's excusing E.F.W. Therefore, we conclude that the trial court's error in excusing E.F.W. was not reversible, because, even with the error, Evans still had a fair trial with an impartial jury."
The Supreme Court found that any error in the trial court's erroneous removal of a juror for cause was harmless because the defendant did not show that the empaneled jury was not impartial. This Court, citing Martinez-Salazar, has likewise found harmless error. See Ray v. State, 809 So.2d 875, 886 (Ala.Crim.App.2001), cert. denied, 809 So.2d 891 (Ala.2001), cert. denied, 534 U.S. 1142, 122 S.Ct. 1096, 151 L.Ed.2d 993 (2002) ("In United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), the defendant used a peremptory challenge to cure the trial court's erroneous denial of a challenge for cause. The United States Supreme Court held that the defendant's right to exercise his peremptory challenges was not denied or impaired when he chose to use a peremptory challenge to remove a juror who should have been challenged for cause."); Smith v. State, 908 So.2d 273 (Ala.Crim.App.2000) ("[A]ny possible error was harmless based on the United States Supreme Court's recent holding in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).").
Therefore, if any error did occur, it was harmless. See Ray v. State, supra; Smith v. State, supra.

B.
Tomlin argues that the trial court erred in failing to grant his challenge for cause of prospective juror P.J. He contends that this juror cried during voir dire after she indicated that she had found her mother-in-laws's body after the mother-in-law had committed suicide, that P.J. admitted *239 that she suffers from anxiety attacks, and that P.J. admitted that the photographs of the victims' bodies might trigger an anxiety attack. Tomlin argues that P.J. should have been struck for cause "because she could not be neutral, objective, or impartial."
The following occurred during the voir dire examination of P.J.:
"The Court: Okay. [P.J.] I think you wanted to make a statement out of the presence of the other jurors.
"[P.J.]: Well, I just may get upset, because when you mentioned the evidence, pictures and things, and I didn't put it on my sheet and I apologize, I honestly didn't think about it, but my mother-in-law was dying of cancer and she committed suicide and I happened to find her and just 
"The Court: Okay, ma'am, I'm sorry and I understand that would bother you, but if you were selected as a juror, understanding that would bother you, but you could still decide the evidence based upon what's presented to you from the testimony and the law that I instruct you?
"[P.J.]: And I may cry.
"The Court: I understand. I understand that. We can't stop that.
"[P.J.]: I don't like guns.
"The Court: Yes, ma'am, I appreciate your candor. Anything else, Mr. Valeska, of [P.J.]?
"[Prosecutor]: No, Your Honor.
"The Court: Mr. Bright?
"[Defense counsel]: [P.J.] you cried a little bit when you answered the question though, right?
"[P.J.]: (Juror nods.)
"[Defense counsel]: You have to give an audible answer, yes or no, for the court reporter?
"[P.J.]: Yes.
"[Defense counsel]: And you think you may have that same reaction if you saw the pictures and so forth, that we talked about earlier?
"[P.J.]: I'd probably be all right, but I have these little anxiety attacks.
"[Defense counsel]: Well, do you think it might interfere with your ability to fairly consider the case?
"[P.J.]: No.
"[Defense counsel]: Well, do you think that you could put it aside and listen to all of the evidence 
"The Court: She's answered the question  just a moment, she's answered the question. Thank you, [P.J.]."[5]
Tomlin argues that we should presume bias based on the above dialogue with P.J. He cites Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), in support of his contention.
In Rideau, the United States Supreme Court reversed the appellant's conviction based on the trial court's failure to grant a motion for a change of venue. The record showed that after Rideau was arrested he confessed to the local sheriff, and the confession was videotaped and audiotaped. The tape was broadcast on local television stations three times before Rideau's trial. The Supreme Court found that Rideau's right to an impartial trial was violated.
In Turner, the United States Supreme Court granted Turner a new trial after two *240 deputies who were key witnesses in the case and who were also in charge of the sequestered jurors had outside contact with the jurors. Neither case is similar to the situation presented in this case.
Prospective juror P.J. indicated that she could impartially try the case. The trial court committed no error in failing to remove this juror for cause.
Moreover, this juror was removed by the defense's use of one of its peremptory strikes.

C.
Tomlin argues that the trial court erred in failing to remove three prospective jurors who were not impartial, he argues, because they indicated that they had heard or read about the case. He contends that this is sufficient to establish a common-law basis to strike these jurors.
However, neither this Court nor the United States Supreme Court has ever required jurors to be totally ignorant about the facts and circumstances of a case. As the United States Supreme Court stated in Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):
"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. Illinois, 123 U.S. 131 [(1887)]; Holt v. United States, 218 U.S. 245 [(1910)] Reynolds v. United States, [98 U.S. 145 (1878)].
"The adoption of such a rule, however, `cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' Lisenba v. California, 314 U.S. 219 [(1941)]. As stated in Reynolds, the test is `whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality. The question thus presented is one of mixed law and fact....' At page 156 [of 98 U.S.]. `The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside....'"
Specifically, Tomlin challenges the trial court's failure to remove prospective jurors S.B., L.R., and G.R. for cause because they answered that they had heard or read about the case. A review of the record reflects that S.B. stated that she had read about the case but that she could not remember any particulars. L.R. stated that he had read in the newspaper in the 1970s that several people had been found dead in or near a car. G.R. stated that he did not remember the details of the case because it happened when he was a teenager but that he did remember that it had happened. All stated that any knowledge that they had about the case would not *241 effect their ability to render an impartial verdict.
Clearly, the vague comments of the three questioned jurors were not sufficient to grant a challenge for cause. As stated in Irvin v. Dowd, supra, we have never held that a juror must be totally ignorant about a case before he/she is eligible to sit on a jury.

VII.
Tomlin argues that the trial court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. The United States Supreme Court in Batson held that the Equal Protection Clause of the United States Constitution forbids the removal of black individuals from a black person's jury solely on the basis of their race. Batson was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), to civil litigants in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and to defense counsel in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).
The party alleging a Batson violation has the burden of establishing a prima facie case of discrimination. It is only when a prima facie case of discrimination has been established that the challenged party must explain its reasons for removing the designated jurors.
Here, Tomlin argues that he established a strong prima facie case. We do not agree. A review of the record shows that Tomlin's only basis for making a Batson objection was the number of strikes the State used to remove black prospective jurors from the venire. Tomlin argues that the prosecutor used 15 of its 25 strikes to remove blacks. Our review of the record reflects that the prosecutor used 13 strikes to remove blacks, 11 strikes to remove whites, and 1 strike to remove an individual of Oriental descent. Defense counsel used all of its 25 strikes to remove whites from the venire. Chosen for Tomlin's jury were: 5 blacks, 5 whites, 1 Mexican-American, and 1 individual who indicated on her jury questionnaire that she was of the "I" race  we assume that this indicates that this juror was of Indian descent.
The trial court, without ruling on whether a prima facie case of discrimination had been established, requested that the State give its reasons for striking the black prospective jurors. Here, because the only basis for the Batson objection was the number of strikes that the State used to remove blacks the trial court could have lawfully found that the defense had failed to establish a prima facie case of discrimination. As we stated in Hall v. State, 820 So.2d 113, 128 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
"[T]he trial court could have lawfully found that no prima facie case of discrimination had been proven if Hall made no further argument on his Batson objection. However, because the trial court found that Hall had made a prima facie case of discrimination and allowed the State to provide its reasons for striking the black prospective jurors, we will evaluate those reasons to determine if there was a Batson violation."
Even though it is highly questionable that the defense established a prima facie case of discrimination, because the trial court heard the prosecutor's reasons for removing the challenged jurors, we will evaluate those reasons. Hall v. State, supra.
When examining a ruling on a Batson objection, a reviewing court uses the guidelines articulated by the Alabama Supreme Court in Ex parte Branch, 526 *242 So.2d 609 (Ala.1987). The Court in Branch stated:
"The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider `all relevant circumstances' which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
"1. Evidence that the `jurors in question share[d] only this one characteristic  their membership in the group  and that in all other respects they [were] as heterogeneous as the community as a whole.' [People v.] Wheeler, 22 Cal.3d [258,] 280, 583 P.2d [748,] 764, 148 Cal.Rptr. [890,] 905. For instance `it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
"2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
"3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)].
"4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal. Rptr. at 905.
"5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla. Dis.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
"6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, [503] So.2d at 352 and 355.
"7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
"9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra."
526 So.2d at 622-23 (footnote omitted). We will only reverse a ruling on a Batson motion if it is clearly erroneous. See Merriweather *243 v. State, 629 So.2d 77 (Ala.Crim. App.1993).
Here, the State offered the following explanations for striking the black prospective jurors:
"[Prosecutor]: Juror Number Thirty-one is [W.V.]. He expressed an opposition to the  to capital punishment. Juror number  I'm sorry  and he's also a minister and also expressed that he had speaking engagements during the week which may cause him to  which would be on his mind. Juror Number Eight, [D.H.], he also stated that he did not believe in capital punishment. He also had problems with the photographs, having to look at possible photographs of people at crime scenes. Juror Number Forty-two, [T.J.], she was represented  she has been represented or was represented by Mr. Yelverton, who was the previous defense counsel in this case and she also had a problem with the photographs. I also noticed during the voir dire that she sat on the front row, another juror had to calm her down and speak to her continuously, and she also said she was just scared to death to be here. State exhibit  pardon me, Number Twenty-eight, [B.A.] 
"The Court: Okay. Forty-two was the next one, is Forty-two not 
"[Prosecutor]: That was who I was talking about, Your Honor, Forty-two.
"The Court: I'm sorry. Twenty-eight is next.
"[Prosecutor]: She responded to the question of philosophical or moral reservations about sitting in judgment of other people. [B.A.] indicated that she had a problem judging other people.
"The Court: Sixty-four.
"[Prosecutor]: The State  [E.H.] represented to the Court that her son was represented by Mr. Madden, who was involved in this case earlier. Also, [E.H.] was a school teacher and the State struck all Board of Ed  all school teachers.
"The Court: Thirteen.
"[Prosecutor]: [J.R.] is single. He's a student and has no children, Your Honor, and we  well, we  he  although this was a  after we determined he was single, had no children, which was another  which was another criteria that we were tactically looking for in this case. [J.R.] also is very small and he looks very young and we just struck him for that reason.
"The Court: Fifty-four.
"[Prosecutor]: [K.J.] is also a school teacher at LeFlore High School, Your Honor.
"The Court: Thirty.
"[Prosecutor]: [J.M.]. Your Honor, also, [J.M.] was young and didn't have any children. There is also one other thing that I would like to approach to discuss that with you, if we could.
"The Court: Okay.
"(Bench conference, on the record.)
"[Prosecutor]: Mr. Moore indicated to me that [J.M.] 
"The Court: Who is Mr. Moore?
"[Prosecutor]: He is the victim's father, Cheryl Moore's father. Was sitting in the jury and that [J.M.] has said or was saying things that were just  how did he put it  strange. He acted strange and he didn't like  he didn't feel comfortable with that juror and the juror sat directly in front of him.
"The Court: What did he say?
"[Prosecutor]: He just made a comment. He didn't relate to me any comment other than he felt uncomfortable about that juror.
"The Court: But you can't tell me anything that this juror said?

*244 "[Prosecutor]: Only that Mr. Moore said he felt uncomfortable. I'm telling you this, he was also on our list, because he was young and he said he didn't have any kids.
"The Court: Okay.
"[Prosecutor]: Number Twelve, [B.T.], she stated  she had one statement about the photos, difficulty looking at pictures. She has children. That was all, Your Honor.
"The Court: Fifty-seven?
"[Prosecutor]: Your Honor, we also normally strike postal workers. That's common for us.
"[Defense counsel]: Does that apply to [B.T.], I'm sorry?
"The Court: That was Number Twelve.
"[Prosecutor]: Postal, right.
"The Court: Number Fifty-seven.
"[Prosecutor]: [R.C.] stated that he had a brother in the penitentiary. I think he also said he had a stepson in the penitentiary. He also said he would not be able to follow the law or follow the instructions. There was interchanging between the Court and [R.C.] until  about his ability to follow the law or follow the instructions of the Court in which he finally did say that he would be able to but he acted reluctant to do that. [S.S.[6]] I'm sorry, Number Twenty-five, [S.S.] He stated that he did not  he had surgery Tuesday. He also stated that he had a business to run and he also stated that he was involved in an incident or his wife or ex-wife was involved in an incident in which nothing was ever done about it from the law enforcement standpoint and that he didn't feel comfortable about that or was upset about that.
"The Court: Fifty-eight.
"[Prosecutor]: [J.H.] was also a young man with no children.
"The Court: Seven.
"[Prosecutor]: We had a good faith belief that [A.L.] had been arrested and convicted of DUI.
"The Court: Twenty-five.
"[Prosecutor]: I'm sorry, Your Honor, Seventy-five, is that 
"The Court: I'm sorry. Seventy-five.
"[Prosecutor]: Yeah, [J.J.] stated her opposition to the death penalty yesterday, but later when called back in individual voir dire stated that she could follow the law, but she would feel very uncomfortable if she felt like it was her responsibility at some later point that the person that she was judging would receive the death penalty.
"The Court: Seventy-one.
"[Prosecutor]: Just a moment, Your Honor, please.
"(Pause.)
"Your Honor, at the point of the last strike for [S.P.] that  as far as we were concerned, he's on the jury.[[7]] We had to strike somebody, we struck Number Seventy-one. That's the only reason why we struck him.

*245 "The Court: You didn't give no reason for striking Seventy-one?
"[Prosecutor]: He was young, Your Honor."
After the prosecutor offered his explanations defense counsel stated the following:
"I won't address all of the strikes, but I do want to make it clear that our objection goes to each and every one of the strikes and the insufficiency of the reasons given. The reasons here, Your Honor, are the kind that Courts have recognized as patently inadequate. Some people were struck because they had no children. Some people were struck because they had children. There are no other categories a person can fall into except either having children or not having children and I think thisCourt have seen that as indicia of pretextual reasons. In addition to that, Your Honor, of course, the strength of the prima facie case given how disproportionate the numbers are here, both in terms of the number of strikes used and how great an impact it had on the number of African Americans in the pool, but I would in particular point the Court's attention number thirtyexcuse me, Number Thirteen, [J.R.], who was struck because he was small and looks young and has no children, makes no earthly sense as a reason to strike somebody from a jury. [J.N.] struck because he was young and had no children and then based on some vague conclusory statement, a hearsay statement, that the State had but couldn't elaborate on. I would point out, Your Honor, there were similarly situated white jurors and I would just point to a couple. Number Eleven, [J.R.] was a young white person who didn't have any children and who wasn't struck from the jury. [M.S.] number forty-seven was a young white woman with one child and I would suggest, Your Honor, that the evidence is that similarly situated people were not treated the same. I would point out that with regard to Number Seven, [A.L.] in a good faith belief that he had a DUI, there was absolutely no questioning. We had an opportunity to question every juror individually about anything that might be a basis for either a peremptory strike or a strike for cause. There is no questioning at all about [A.L.] about any prior DUI or driving under the influence that he may have had. For that reason, Your Honor, with regard to these in particular but with regard to all of the reasons, we would ask the Court not to allow the challenge and prohibit them under Batson. I mean, this is like pre-Batson, Your Honor."
After this exchange the trial court questioned the prosecutor about his failure to remove a white prospective juror, J.R., who was 21 years of age. The prosecutor explained that he struck all jurors who were unmarried and had no children. J.R. was married. On appeal, Tomlin argues primarily that the trial court erred in denying his Batson objection because one young white juror, J.R., was left on the jury.
Our review of the prosecutor's strikes shows that the first two strikes were used to remove white individuals. The fourth and sixth strikes were used to remove white unmarried individuals who were 20 years of age. The State's ninth strike was used to remove a 29-year-old white unmarried individual. Out of the State's first 10 strikes, the State used 3 to remove young unmarried white individuals and 1 to remove a 24-year-old unmarried black individual. The record indicates that J.R. was married, although she was young. The prosecutor's use of his strikes did not reflect any pattern of discrimination. Also, a *246 review of the voir dire examination does not show that any particular race of jurors were questioned more or less than others. Moreover, the prosecutor struck 11 whites, and the majority of the prosecutor's first strikes were used to remove white prospective jurors. Most importantly, the record shows that defense counsel used every one of its 25 peremptory strikes to remove white prospective jurors from the venire. This placed the prosecution in a very tenuous position. Last, five blacks served on Tomlin's jury along with five whites.
Although we have noted that age may be a suspect reason, we have also upheld strikes based on age. See Russell v. State, 739 So.2d 58 (Ala.Crim.App.1999). As this Court stated in Russell, 739 So.2d at 65:
"`[B]ecause the State treated blacks and whites similarly in its strikes based upon age, the trial court properly denied [the appellant's] Batson motion.' Wright v. State, 601 So.2d 1095, 1099 (Ala.Cr.App. 1991) (`[T]he State did strike all males in the 20-39 age group and all females in the 30-39 age group, whether those persons were black or white, based upon its rationale that persons in that age group were more likely to have, or to know persons who have, experimented with illegal drugs'). Where there is no disparate treatment among veniremembers, the trial court's finding of neutrality in the use of peremptory strikes is not clearly erroneous. Mitchell v. State, 579 So.2d 45, 47 (Ala.Cr.App.1991); Ward v. State, 539 So.2d 407, 408 (Ala.Cr.App.1988). Thus, the prosecutor provided a race-neutral reason for striking veniremembers numbers 21, 58, and 82 based on their age."
Tomlin also challenges the prosecutor's strike of A.L. The prosecutor stated that this juror was struck because the prosecution's records indicated that A.L. had a prior conviction for driving under the influence. The following occurred:
"[Prosecutor]: We have a report from the DA's office, Your Honor.
"The Court: Does it show a conviction?
"[Prosecutor]: It says, guilty. I don't have itI don't have a certified copy of the conviction with the representation by an attorney. All I have is a preliminary indication that he is guilty of a DUI.
"The Court: Based on the record checked by the local District Attorney's Office?
"[Prosecutor]: Yes, Your Honor.
"The Court: Can I see what you have?
"(Pause.)
"But that information was just given to the State verbally or was this handout actually given to the
"[Prosecutor]: That handout was given to the clerk's office.
"The Court: And that information written on there was supplied by the DA's Office?
"[Prosecutor]: Yes, Your Honor.
"The Court: Have you had a chance to review
"[Defense Counsel]: No, Your Honor, I'd like to see it. Well, for the record, Your Honor, all this shows is
"The Court: It will be marked as a Court's Exhibit and introduced into the record.
"[Defense Counsel]: Okay. Thank you, Your Honor."
The trial court reviewed the documents that formed the basis of this strike. Its ruling is supported by the record. A veniremember's involvement with criminal activity is a race-neutral reason for removing *247 a juror. See Naismith v. State, 615 So.2d 1323 (Ala.Crim.App.1993).
The reasons advanced for striking the remainder of the black prospective jurors were not questioned at trial. We have stated, "There is no requirement that a prosecutor establish evidentiary support for every strike in every case, especially where the defendant has not specifically questioned the validity of the prosecutor's explanations or demanded further proof." Hall v. State, 816 So.2d 80, 85 (Ala.Crim. App.1999). However, because this is a capital case, we will consider this argument on appeal.
One black prospective juror was struck because of his occupationhe was a teacher at a local high school. However, there is absolutely no evidence in the record, the voir dire, or the juror questionnaires, indicating that there was a white juror who was a teacher and who was not struck by the State. As the Alabama Supreme Court stated in Meads v. RPM Pizza, Inc., 639 So.2d 1352 (Ala.1994):
"If Meads had proved that a white nanny or another white veniremember employed in a `caring' or `hearing' occupation had been empaneled as a juror, there would be evidence that the reason or explanation given by Domino's was a sham or a pretext for discrimination. Such disparate treatment of otherwise similarly situated persons, who happen to be of different racial backgrounds, would be evidence that the asserted race-neutral reason was a sham or a pretext. See, Ex parte Branch, 526 So.2d 609, 623-24 (Ala.1987). The record contains no evidence that such a white veniremember sat on the jury. Based upon the undisputed merit in peremptorily striking three of the four African-American jurors, the trial court could have reasonably concluded that there was no racial motivation in striking the fourth African-American juror based upon her occupation."
639 So.2d at 1354.
The remaining strikes were race-neutral. Strikes based on a juror's views toward capital punishment do not violate Batson. See Lucy v. State, 785 So.2d 1174 (Ala.Crim.App.2000). Striking a juror based on the fact that he or she has previously been represented by defense counsel is a reason that does not violate Batson. See Ward v. State, 539 So.2d 407 (Ala. Crim.App.1988).
"When reviewing a trial court's ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous." Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). We cannot say, after reviewing the record, the factors articulated in Branch, the fact that defense counsel struck all 25 whites from the venire, and the composition of the jury, that the reasons advanced by the prosecutor were merely a sham. There is no evidence indicating that the trial court abused its substantial discretion in denying the Batson motion.
Moreover, applying the federal law announced in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), we can find no Batson violation. The Purkett Court held that "[w]hat it means by a `legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." 514 U.S. at 769, 115 S.Ct. 1769.
The federal courts, starting with Purkett v. Elem, have eased the standards for reviewing Batson claims. The Alabama Supreme Court in Ex parte Bruner, 681 So.2d 173 (Ala.1996), when quashing a petition for certiorari review, explained that federal caselaw such as Purkett does not control the Batson law in Alabama because *248 it is governed by "adequate and independent state law." 681 So.2d at 173. See also Looney v. Davis, 721 So.2d 152 (Ala. 1998).
After the Alabama Supreme Court's decisions in Bruner and Looney, the Court released Ex parte Melof, 735 So.2d 1172 (Ala.1999). Justice Houston, writing for the Alabama Supreme Court in Melof, stated, "[W]e now restate what the Justices of this Court correctly declared in 1949, that `there is no equal protection clause in the Constitution of 1901.' Opinion of the Justices No. 102, supra, 252 Ala. [527] at 530, 41 So.2d [775] at 777 [(1949)]." 735 So.2d at 1186. The effect of Melof's holding on Alabama's Batson law is not clear because the Alabama Supreme Court has not had occasion specifically to address this issue. However, Justice Houston had previously stated in a special concurrence denying certiorari review in Ex parte Weaver, 682 So.2d 493, 493 (Ala.1996):
"I believe in all parties' right to the peremptory challenge, and I have struggled to try to preserve that right and comply with Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The United States Supreme Court in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), encouraged me in my hope that the peremptory challenge would survive. However, the majority of this Court refuses to allow Purkett v. Elem, to control Alabama's peremptory challenge procedure. Ex parte Bruner, 681 So.2d 173 (Ala. 1996). I do not see how the peremptory challenge can permanently endure with litigants having the right to peremptorily challenge some jurors but not other jurors. Do all potential jurors not have an equal right to serve as jurors regardless of race or gender?"
The Supreme Court's decision in Melof may be a signal that it has modified its views on applying federal caselaw to Batson claims raised in Alabama courts.
However, we hold that the trial court did not abuse its discretion in denying the Batson motion under Alabama law.

VIII.
Tomlin argues in brief that "the trial court's practice of summarily implementing the more restrictive of two possible remedies for a Batson violation made the assertion of the Batson challenge impracticable in this case and effectively denied Phillip Tomlin his right to equal protection under the Fourteenth Amendment."
We fail to see how this argument pertains to Tomlin's Batson objection. After Tomlin made his Batson objection and the discussion concerning Tomlin's objection was concluded, the following occurred:
"[Prosecutor]: Yes, Your Honor. We would make a reverse Batson challenge based on the fact that the Defense struck 25 out of 25 white jurors and, specifically, we wouldwe would challenge
"The Court: And the State is requesting and the State wants to be heard on all 25 challenges for the Defense?[[8]]
"[Prosecutor]: I'm gonna pick those individuals out. Juror Number Twenty, Juror Number Thirty-two.
"The Court: Okay. So the State wants to be heard on a reverse Batson and throughout the entire panel.
"[Prosecutor]: Those jurors which
"The Court: Well, that's the only alternative I have if I hear your motion and grant your motion.

*249 "[Prosecutor]: Well it depends, Your Honor, on different 
"The Court: Well, that's fine. I was just telling you we'll hear each one you have an objection to and I'll give the other side an opportunity to either
"[Prosecutor]: Your Honor, just so we're clear onif we're clear on, if the individual is wrongly struck, if you should find that
"The Court: I'll throw out the panel.
"[Prosecutor]: The entire panel?
"The Court: That's right.
"[Prosecutor]: Okay. And is it the practice of some Courts to put one on
"The Court: I don't put any jurors on.
"[Prosecutor]: Okay. Your Honor, well then we'll withdraw our motions, with our understanding that that was the that was the waywe don't believe that it would be correct to throw out this entire panel, Judge.
"The Court: I don'tthat's the practice of my court.
"[Prosecutor]: Well, we wouldn'tYour Honor, I'm not saying
"The Court: I understand that each judge is different. Some judges do that. I don't do it that way.
"[Prosecutor]: I'm not saying it's incorrect, I mean, we don't believe that, but it isbut we do believe and we want to say for the record that is hypocrisy, Your Honor, when the jury is made up as it is, 50 percent
"The Court: If you want to be heard on that, I will hear you.
"[Prosecutor]: We'll withdraw our motion, Your Honor.
"The Court: [Defense Counsel].
"[Defense Counsel]: Yes, Your Honor. And I take it that Your Honor would have done the same thing if you would have granted our motion.
"The Court: I would have done the same thing."
Initially, we note that at no time in the above discussion did defense counsel object to the trial court's method of remedying the Batson objection. The only party to suffer any adverse ruling on this issue was the Statenot the defense. The State argued that defense counsel used all of his 25 strikes to remove white prospective jurors. Because defense counsel did not object to this issue in the trial court, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
As we recently stated in Dorsey, supra:
"While Alabama has recognized that a proper way to remedy a Batson violation is to excuse the entire venire and to start anew, see Ex parte Branch, 526 So.2d 609 (Ala.1987), on remand, 526 So.2d 634 (Ala.Crim.App.1988), we have also held that another way to cure a Batson objection is to place a juror who was improperly removed back on the venire. See O'Neal v. State, 602 So.2d 462, 465 (Ala.Crim.App.1992). The United States Supreme Court in Batson specifically refused to `formulate particular procedures' to remedy a Batson violation; instead it left this decision to the state and federal courts. Batson, 476 U.S. at 99, 106 S.Ct. 1712.
"The Maryland Court of Appeals in Jones v. State, 343 Md. 584, 683 A.2d 520 (1996), thoroughly reviewed the methods of curing Batson violations used by the different state and federal courts. The Jones court stated:
"`Some jurisdictions require trial courts finding a Batson violation to disallow the strike or to re-seat the improperly stricken juror. See Ellerbee v. State, 215 Ga.App. 312, 450 S.E.2d 443, 448 (1994); State v. Grim, 854 S.W.2d 403, 416 (Mo.1993), cert. *250 denied, Grim v. Missouri, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993) ("[T]he proper remedy for discriminatory use of peremptory strikes is to quash the strikes and permit those members of the venire stricken for discriminatory reasons to sit on the jury if they otherwise would."); Conerly v. State, 544 So.2d 1370 (Miss. 1989) ("Having determined that the state's explanation did not provide a valid reason for striking Swain, the trial court was obligated to seat her on the jury unless the state could suggest another racially neutral reason for striking her."); U.S. v. Robinson, 421 F.Supp. 467, 474 (D.Conn. 1976), aff'd, 556 F.2d 562 (2nd Cir. 1977).
"`A minority of jurisdictions require the trial court to discharge the entire venire and conduct jury selection from a newly convened venire. See State v. McCollum, 334 N.C. 208, 433 S.E.2d 144, 159 (1993), cert. denied, McCollum v. North Carolina, 512 U.S. 1254, 114 S.Ct. 2784, 129 L.Ed.2d 895 (1994) (the court noted that while neither reseating the stricken jury nor discharging the entire panel was inconsistent with the procedure required by Batson to remedy such a violation, "the simpler and ... clearly fairer approach is to begin the jury selection anew...."); People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 907, 583 P.2d 748, 765 (1978). See Minniefield v. State, 539 N.E.2d 464 (Ind.1989) (holding that the trial court erred by failing to grant mistrial as result of prosecution's Batson violation).
"`The majority of courts, however, have delegated to the discretion of the trial judge the determination of the appropriate remedy for a Batson violation. See e.g. State v. Franklin, 318 S.C. 47, 456 S.E.2d 357, 360 (1995), cert. denied, Franklin v. South Carolina, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995) ("We hold ... that it is within the trial judge's discretion to fashion the appropriate remedy under the particular facts of each case". . . . (citation omitted)); Ezell v. State, 909 P.2d 68, 72 (Okla.Crim.App. 1995) ("We adopt this flexible approach as the best solution. We interpret Batson as suggesting that either remedy may be appropriate depending on the particular circumstances at trial"). Commonwealth v. Fruchtman, 418 Mass. 8, 633 N.E.2d 369, 373 (1994), cert. denied, Fruchtman v. Massachusetts, 513 U.S. 951, 115 S.Ct. 366, 130 L.Ed.2d 319 (1994)("Choice of remedy was ... the prerogative of the judge"); Haschke v. Uniflow Manufacturing Co., 268 Ill.App.3d 1045, 206 Ill.Dec. 387, 391, 645 N.E.2d 392, 396 (1994); Friedman v. State, 654 So.2d 50, 52 (Ala.Crim.App.1994), cert. denied, No. 1940189 (Ala.1995); Koo v. State, 640 N.E.2d 95, 100 (Ind.Ct.App. 1994) ("Clearly, the remedy which a particular trial court employs upon a finding of purposeful discrimination is a matter left to the court's discretion."); State ex rel. Curry v. Bowman, 885 S.W.2d 421, 425 (Tex.Crim. App.1993), cert. denied, Texas v. Bowman, 513 U.S. 866, 115 S.Ct. 184, 130 L.Ed.2d 118 (1994) ("[W]here a Batson claim is sustained the court may fashion a remedy in its discretion...."); Jefferson v. State, 595 So.2d 38, 41 (Fla.1992) ("[I]t is within the trial judge's discretion to fashion the appropriate remedy under the particular facts of each case...."); People v. Irizarry, 165 A.D.2d 715, 560 N.Y.S.2d 279, 281 (1990); State v. Walker, 154 Wis.2d 158, 453 N.W.2d 127, 135 n. 12 (1990), cert. denied, 498 *251 U.S. 962, 111 S.Ct. 397, 112 L.Ed.2d 406 (1990); U.S. v. Forbes, 816 F.2d 1006, 1011 (5th Cir.1987).'
"343 Md. at 594-95, 683 A.2d at 525-26. Alabama is one of the jurisdictions that leave the choice of the method to deal with a Batson violation to the sound discretion of the trial court. See Ex parte Branch, supra. Alabama has never required that the trial court follow a certain procedure. We believe that the method used will depend on the facts presented in each case."
881 So.2d at 488-89. There was no plain error here.

IX.
Tomlin argues that the trial court erred in allowing a transcript of his testimony at his first trial to be read into evidence at his fourth trial. Tomlin argues that his testimony at his first trial was involuntary, that it was compelled because of the unconstitutional statutory scheme, and that it was given because his trial counsel had rendered ineffective assistance of counsel.
In Willingham v. State, 50 Ala.App. 363, 279 So.2d 534 (1973), cert. denied, 291 Ala. 803, 279 So.2d 538 (1973), this Court stated:
"It is the general rule that a defendant who voluntarily takes the witness stand in his own behalf and testifies without asserting the privilege against self-incrimination, waives his privilege as to the testimony given and the same may be used against him in a subsequent trial for the same offense. Decennial Digest, Criminal Law, [key cite] 406(4) and 539(2). This rule is so broad that even if the defendant does not take the stand at the second trial this does not prevent the use of his testimony at the former trial.
"In Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 [(1968)], the court per Mr. Justice Stewart said:
"`In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is not less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.'
"In this state this rule is applied to inculpatory statements in transcript of testimony voluntarily given by a defendant in the prosecution of another for crime. Green v. State, 24 Ala.App. 235, 133 So. 739 [(1931)]."
Five years later in Ashurst v. State, 462 So.2d 999 (Ala.Crim.App.1984), we stated:
"The general rule is that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Koch v. State, 401 So.2d 796, 801 (Ala.Cr.App.), cert. denied, Ex parte Koch, 401 So.2d 801 (Ala.1981); Cantrell v. State, 353 So.2d 80, 82 (Ala.Cr.App. 1977); Willingham v. State, 50 Ala.App. 363, 367, 279 So.2d 534, cert. denied, 291 Ala. 803, 279 So.2d 538 (1973). However, this rule does not apply where the former testimony was given at a hearing where the accused was denied his right to the assistance of counsel, People v. Martin, 21 Mich.App. 667, 176 N.W.2d 470 (1970), or where the former testimony was `impelled' in order to rebut evidence *252 introduced against the accused in violation of his constitutional rights. Harrison, supra."
462 So.2d at 1008.
In Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the United States Supreme Court addressed the issue whether a defendant's testimony at a previous trial was admissible at a subsequent retrial for the same offense. In Harrison, the defendant testified at his first trial after the State had introduced three confessions he had made while he was in police custody. On appeal, Harrison's conviction was reversed. The Court of Appeals found that the confessions were illegally obtained. At Harrison's retrial, his prior testimony was read into evidence. The appeals court affirmed, and the United States Supreme Court granted "certiorari to decide whether the petitioner's trial testimony was the inadmissible fruit of the illegally procured confessions." 392 U.S. at 221, 88 S.Ct. 2008 (footnote omitted). The Supreme Court held that Harrison's testimony should not have been admitted at his retrial. The Court stated that the State failed to demonstrate that "the petitioner's testimony was obtained `by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint.' Wong Sun v. United States, 371 U.S. 471, 488." 392 U.S. at 226, 88 S.Ct. 2008.
Here, the conviction resulting from Tomlin's first trial was not reversed because of the unlawful admission of a confession. Tomlin's first conviction was reversed on second application for rehearing by the Alabama Supreme Court because of an improper prosecutorial argument made in closing argument. There was no confession introduced. Nor is there any claim or any suggestion in the record that Tomlin's testimony in his first trial was made while Tomlin was denied his right to the assistance of counsel.
As we stated in Whitehead v. State, 777 So.2d at 822:
"Here, `the record ... clearly shows that [Whitehead] intelligently waived his constitutional right to remain silent. [He] voluntarily took the stand and testified [at his codefendant's trial] under the guidance and supervision of his counsel and in the presence of and under the protection of the trial court.' Ex parte Godbolt, 546 So.2d [991] at 996 [(Ala.1987)]. Whitehead was not `impelled' to testify to rebut evidence against him, nor was he denied the right to assistance of counsel. In fact, the record shows that Whitehead's counsel advised him not to testify at [his codefendant's] trial, advice that Whitehead chose not to follow.... Thus, we find no error, plain or otherwise, in the admission into evidence of Whitehead's prior testimony."
Tomlin further argues that the State failed to meet its burden of proving that Tomlin's prior testimony was voluntary. Tomlin cites Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), in support of this contention. In Harrison, the United States Supreme Court stated,
"[h]aving illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used. `The springs of conduct are subtle and varied,' Mr. Justice Cardozo once observed. `One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others.' Having `released the spring' by using the petitioner's unlawfully obtained confessions *253 against him, the Government must show that its illegal action did not induce his testimony."
392 U.S. at 224, 88 S.Ct. 2008 (quoting DeCicco v. Schweizer, 221 N.Y. 431, 438, 117 N.E. 807, 810 (1917)) (footnotes omitted; emphasis added). The Supreme Court explained this quote by stating that the prosecution has always had the burden of proving that a subsequent statement made after an involuntary statement "`was not directly produced by the existence of the earlier confession.'" 392 U.S. at 225 n. 12, 88 S.Ct. 2008 (quoting Darwin v. Connecticut, 391 U.S. 346, 351, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), (Harlan, J., concurring in part and dissenting in part)).
The holding in Harrison has no application in this case. No confession was admitted in Tomlin's first trial or any subsequent trial. Nor were any of Tomlin's convictions reversed based on the erroneous admission of an involuntary confession. There was no confession in this case. Tomlin's prior testimony consisted of establishing an alibi for the time that he was seen in Mobile the day before and day of the murders. The State was not obliged to establish that Tomlin's prior testimony was not induced by the unlawful admittance of a confession; therefore, the holding in Harrison was not controlling. Tomlin's prior testimony was correctly received into evidence at his fourth trial.
Moreover, at Tomlin's second and third trials his former testimony was admitted into evidence. On the appeal of each conviction we found no plain error in its admission.

X.
Tomlin argues that the trial court erred in allowing a State's witness, Sanford Henton, a retired captain with the Prichard Police Department, to testify that David Tomlin's death was ruled accidental.
Capt. Henton testified that he investigated David Tomlin's death in November 1975. Instead of going into every aspect of the investigation, Capt. Henton was allowed to testify, over defense objection, that he determined that David Tomlin's death was accidental. He based this finding on the scene of the shooting, the toxicologist findings, and the coroner's findings.
On appeal, Tomlin argues that the trial court erroneously admitted this testimony because it was based on facts the witness did not personally observe. Although Capt. Henton did not personally observe the shooting that took David Tomlin's life, his opinion that the shooting was an accident was admissible. Rule 701, Ala. R.Evid., states:
"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."
Here, Capt. Henton supervised the investigation into David Tomlin's death and formed a conclusion about the shooting. He correctly shared that conclusion with the jury instead of relating every aspect of his investigation.
In Acklin v. State, 790 So.2d 975, 1004 (Ala.Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001), this Court stated:
"`Alabama has long recognized ... that a lay witness may give an opinion when the witness is unable to relate the facts to the jurors well enough to place the jurors in as good a position as the witness was in to reach an opinion or to draw a conclusion. *254 Some would call this the "collective facts" exception to the opinion evidence rule.'
"Advisory Committee's Notes to Rule 701, Ala.R.Evid.
"In this case, the witness's opinion amounted to this sort of shorthand recitation of the facts and was admissible under Rule 701, Ala.R.Evid."
See McGahee v. State, 554 So.2d 454, 463 (Ala.Crim.App.1989), aff'd, 554 So.2d 473 (Ala.1989) ("`Consequently, a witness, who has had an opportunity to observe (sees, hears, feels, tastes, or smells ...) the facts concerning which he is to testify, may testify on his "belief," his "best recollection," or his "understanding." A witness may also testify that something "looked like" or "seemed like" something.'"). See also Dysart v. State, 581 So.2d 541 (Ala.Crim.App. 1990), cert. denied, 581 So.2d 545 (Ala. 1991); McWilliams v. State, 476 So.2d 1244 (Ala.Crim.App.1985); Andrews v. State, 473 So.2d 1211 (Ala.Crim.App.1985); Tice v. State, 460 So.2d 273 (Ala.Crim.App. 1984); Wyrick v. State, 409 So.2d 969 (Ala. Crim.App.1981); Murrell v. State, 377 So.2d 1102 (Ala.Crim.App.1979), cert. denied, 377 So.2d 1108 (Ala.1979); Madison v. State, 40 Ala.App. 62, 109 So.2d 749 (1958), cert. denied, 268 Ala. 699, 109 So.2d 755 (Ala.1959); Nugent v. State, 28 Ala. App. 182, 181 So. 707 (1938), cert. denied, 236 Ala. 213, 181 So. 709 (Ala.1938).
As the State argued at trial, the circumstances surrounding David Tomlin's death were admissible at Tomlin's trial as tending to prove his motive for murdering Ricky Brune. Motive evidence is always admissible. Benefield v. State, 726 So.2d 286 (Ala.Crim.App.1997).
Moreover, Tomlin testified that the shooting involving his brother was accidental. Therefore, if the admission of this evidence was error it was rendered harmless by Tomlin's own testimony. "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). "The erroneous admission of evidence that is merely cumulative is harmless error." Dawson v. State, 675 So.2d 897, 900 (Ala. Crim.App.1995), aff'd, 675 So.2d 905 (Ala. 1996).
Tomlin also argues that the trial court erred in allowing Henton to testify about the relationship between Ricky Brune and David Tomlinthat Brune told him that he and David Tomlin had been friends. Specifically, he contends that this evidence was hearsay. Even if this evidence was hearsay, its admission was harmless. James Steven Heasling, the first defense witness, testified that he, Ricky Brune, and David Tomlin were friends. Thus, this evidence was lawfully before the jury.

XI.
Tomlin argues that the trial court erred in allowing a letter written by Tomlin's father, Jack Tomlin, to be introduced into evidence. Specifically, he contends that this letter was hearsay and that its admission violated numerous of his constitutional rights.[9]
*255 During the examination of Willie Edward Estes, a former deputy with the Mobile County Sheriff's Department, the letter was offered and admitted into evidence. The following occurred:
"[Prosecutor]: Judge, we'd offer State's Exhibit One.
"The Court: Any objections?
"[Defense Counsel]: No objection, Your Honor.
"The Court: It's admitted.
"(State's Exhibit Number One was admitted into evidence.)
"The Court: Anything else of this witness?
"[Prosecutor]: No, Your Honor."
Because defense counsel did not object to the admission of the letter, we must evaluate this argument only for plain error. Rule 45A, Ala.R.App.P.
Not only did defense counsel not object to the admission of the letter, defense counsel questioned this witness in-depth about the contents of the letter. The prosecution elicited very little information from this witness concerning the contents of the letter. However, defense counsel conducted the following examination of this witness:
"Q: Let me hand you, if I might, that exhibit that we just identified, I didn't know where it was just a minute ago, State's Exhibit Number One. Now this is the letter to the Circuit Solicitor, Mr. Graddick, that is signed by Jack Tomlin; is that right?
"A: My understanding, yes, sir.
"Q: Yes, sir. And in the first paragraph, this is the one where he said, `The shotgun was fired into the body. This took place while he was asleep in bed'?
"A: Yes, sir.
"Q: And then that's referring to his son?
"A: Yes, sir.
"Q: And the next paragraph, you said, `Ricky Brune admitted firing the gun.'?
"A: Yes, sir.
"Q: Now look just at the next page of that, copies of that letter, according to that document in front of you, were sent, is this not true, Mr. Estes, to the Governor?
"A: Yes, sir.
"Q: Is that true. To the Crime Commission of the State of Alabama?
"A: Yes.
"Q: Mobile County Sheriff?
"A: Yes.
"Q: Foreman of the grand jury?
"A: Yes.
"Q: Chief of police in Prichard?

*256 "A: Yes.
"Q: To the Mobile Press?
"A: Yes.
"Q: WALA Television?
"A: Yes, sir.
"Q: WUNI?
"A: Yes, sir.
"Q: And the State Attorney General's Office?
"A: Mine runs out right there, sir. Let me see, yes.
"[Defense counsel]: That's all. Thank you very much."
Tomlin argues that the contents of the letter were hearsay and inadmissible. Hearsay is defined in Rule 801(c), Ala. R.Evid., as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
Clearly the letter was not admitted to prove the truth of the contentsthat the district attorney's office was no longer investigating Tomlin's son's death. The letter was offered to prove the state of mind of the declarant. Danny Shanks testified that the Tomlin family had bad feelings toward Richard Brune because they believed that the shooting of David Tomlin was not an accident.
The trial court properly allowed the letter to be received into evidence.

XII.
Tomlin argues that the trial court committed reversible error in allowing a ticket issued for the parking lot at the New Orleans International Airport to be introduced into evidence. He cites the case of Bowden v. State, 542 So.2d 335 (Ala.Crim.App.1989), in support of this contention.
In Bowden, a cash-register receipt from a Hardee's fast-food restaurant was introduced into evidence. The officer who found the receipt in the defendant's vehicle testified to the contents of the receipt. The officer based his testimony on what an employee of Hardee's had told him about the contents of the receipt. In reversing Bowden's murder conviction, this Court stated:
"The state argues that it is evident from the record that [the police officer] was testifying, from his own first-hand knowledge, about the meaning of the numbers on the receipt. Our review of the record does not lead us to the same conclusion. In our opinion, [the police officer's] explanation of the meaning of the entries on the receipt was pure hearsay. Its probative force depended entirely on the competency and credibility of some person other than [the police officer]. The record does not show that [the police officer] had first-hand knowledge of the meaning of the entries, particularly, the entry of `06.67,' which was crucial. His testimony that he `verified' the information and `would have surmised it,' indicates a lack of knowledge. The principal reason for the hearsay rule was violated here. Appellant was denied the right to cross-examine the person who did possess first-hand knowledge of the entries to test the accuracy of the information. (Moreover, the veracity of this person was not subject to scrutiny.) A person from the Hardee's restaurant, with such knowledge, would have been the proper person to be subpoenaed and questioned, under oath, for that purpose. For example, appellant could have questioned this employee on the accuracy of the Hardee's clock or cash register computer."
542 So.2d at 339.
In this case, Vonda Wilding, manager of the ground parking lot at the New Orleans *257 International Airport, explained the procedure when a vehicle enters the parking lot. She testified that the ticket dispenser at the entrance to the lot dispenses a ticket. A parking ticket was discovered by police after searching Tomlin's sister's car found abandoned at the New Orleans International Airport parking lot. Wilding testified to the entries on the ticket. She testified that the ticket contained the date, time, and year the car entered the parking lot. Wilding was the ideal person to testify concerning the parking ticket. She testified that she performed the maintenance on the machine. She could have been cross-examined about the machine's accuracy.
Bowden does not hold, as Tomlin implies in his appellate brief, that the contents of a cash-register receipt are hearsay. It was not the admission of the cash-register receipt that this Court found offensive in Bowden, but the hearsay statements of the officer concerning the entries on the receipt.
Here, Wilding had firsthand knowledge about the entries on the parking ticket. This ticket was correctly received into evidence after a proper predicate for its admission was made. There is no error here.

XIII.
Tomlin argues that the trial court erred in allowing James L. Small, a former toxicologist with the Alabama Department of Forensic Sciences, to be qualified as a ballistic expert and a pathologist.
The following occurred when James Small was examined:
"Q [Prosecutor]: State your name, please, sir, for the ladies and gentlemen of the jury and the Court.
"A: My name is James L. Small.
"Q: And, Dr. Small, what do you do?
"A: I am currently employed by the Baldwin County District Attorney's Office, working in environmental science.
"Q: Prior to that, did you work for the Alabama Department of Forensic Sciences here in Mobile?
"A: Approximately, 25 years.
"Q: And you were the state toxicologist here in the old courthouse?
"A: That's correct, sir.
"Q: And you were such employed in 1977 and 1978?
"A: That's correct, sir.
"Q: Would you tell the ladies and gentlemen of the jury what a toxicologist is and does, please, sir?
"A: Well at that time, the toxicologist for the State of Alabama was charged with investigation of crimes that he was called to by law enforcement, examination of evidence submitted by law enforcement, examination of scenes, and examination of bodies that were involved in crime.
"Q: And how long had you been doing this prior to 1977?
"A: Approximately, 12 years.
"Q: And where did you get your education?
"A: I received a bachelor's degree and a master's degree from Auburn University. The master's degree was in toxicology.
"Q: And how many violent deaths and evidence had you examined, in your best judgment, prior to January 2, 1977?
"A: I had examined approximately 500 bodies involved with violent deaths, prior to that time.
"Q: And did you have any other special training in which you otherwise told the jury?
"A: In our profession, we regularly attend short courses, seminars, and training *258 programs that deal with specific items or specific types of evidence that we are to handle and make examinations on.
"[Prosecutor]: Judge, at this time, I'd ask for Mr. Small as an expert.
"The Court: Any objections from the Defense?
"[Defense Counsel]: Yes. Can I just voir dire on the qualifications?
"....
"Q [Defense Counsel]: Okay. Okay. Now, and your area of expertise would be then, in the area of toxicology is poisons; is that correct?
"A: The trainingthe academic training was an area of toxicology. The training that we further received as part of our employment and part of our duties with the State of Alabama, involved the conduction of autopsies, determining cause of death, collection of evidence from bodies, scenes, evaluating that evidence, making scientific determinations as to what the evidence relates to and then testifying in court.
"....
"Q: [Defense Counsel]: Okay. Your experience was kind of, would it be fair to say, on-the-job and going to some seminars from time to time?
"A: Being taught specifically what to do on the job and special courses, yes, sir.
"....
"A: Well, in particular, with firearms, we spent several months in the laboratory examining bullets, examining items from bullets, and shotgun shells and firearms, firing these, making test comparisons until the senior examiners knew that we could sit down and make a comparison of a bullet to a particular firearm and get the correct answer.
"[Prosecutor]: Judge, we offer him as an expert.
"The Court: Any objections from the Defense?
"[Defense Counsel]: I'm sorry, he's an expert in what, Your Honor?
"[Prosecutor]: In toxicology, in autopsies, and everything that he just testified to.
"[Defense counsel]: I don't have any problem with him testifyingI think he's an expert in toxicology, Your Honor. I don't believe he's established expertise in any other area.
"The Court: Noted for the record, overruled. Proceed."
Tomlin does not question Small's qualifications as a toxicologist. However, he contends that Small was not qualified to testify about the victims' causes of death nor was he qualified to testify concerning ballistic information. We do not agree.
Mr. Small testified that Dr. Edwin Scott, who was the coroner for Mobile County at the time of the murders, performed the autopsies on both victims. Small testified that Scott died shortly after he conducted the autopsies. Small further testified that he was present when the autopsies were conducted and, from his testimony, it appears that he assisted with the autopsies.
The appellate courts of this state have long held that a toxicologist may testify as to the cause of death. In Luckie v. State, 55 Ala.App. 642, 318 So.2d 337 (Ala.Crim. App.), cert. denied, 294 Ala. 764, 318 So.2d 341 (1975), this Court addressed the same issue concerning James Small, the same toxicologist in this case. This Court stated:
"At the conclusion of the testimony offered by the State the appellant moved to exclude on the grounds that the State had not proved the cause of death of *259 decedent; that James Small, a toxicologist, who testified for the State as to the cause of death was not properly qualified to give such testimony; and that there had been no expert testimony to show the cause of death.
"The question of the qualifications of a person to testify as an expert rests largely in the discretion of the trial court and will not be disturbed by the appellate courts in the absence of abuse. See numerous cases collected in Alabama Digest, Criminal Law, Volume 6, [key cite] 481.
"The case of Richardson v. State, 39 Ala.App. 207, 98 So.2d 59, cert. denied, 266 Ala. 699, 98 So.2d 65 [(1957)], along with many other cases, holds that a toxicologist, properly qualified, may testify as to the cause of death."
55 Ala.App. at 644-45, 318 So.2d at 340. See also Dobbins v. State, 274 Ala. 524, 149 So.2d 814 (1963) (a state toxicologist was correctly allowed to testify that the cause of the victim's death was bullet wounds to the head); Johnson v. State, 272 Ala. 633, 133 So.2d 53 (1961) (an assistant state toxicologist was properly allowed to testify that the victim died as a result of blunt-force injuries); Smarr v. State, 260 Ala. 30, 68 So.2d 6 (1953) (a state toxicologist was properly allowed to testify that one of the victims died as a result of a fractured skull); Collins v. State, 250 Ala. 58, 33 So.2d 18 (1947) (a toxicologist was properly allowed to testify that the victim died of a bullet wound to skull); Wilson v. State, 243 Ala. 1, 8 So.2d 422 (1942) (a toxicologist was properly allowed to testify that the victim was poisoned); Hall v. State, 49 Ala.App. 695, 275 So.2d 374 (1973) (a toxicologist was properly allowed to testify that the victim's cause of death was blunt-force injuries to the head); Holland v. State, 49 Ala.App. 104, 268 So.2d 883 (1972) (a toxicologist was properly allowed to testify that the victim died of gunshot wounds); Richardson v. State, 39 Ala.App. 207, 98 So.2d 59 (1957), cert. denied, 266 Ala. 699, 98 So.2d 65 (1957) (a toxicologist was properly allowed to testify that the victim died from a bullet wound to the chest).
Here, Small was properly qualified to testify that in his opinion the victims died of multiple gunshot wounds. Moreover, we note that the causes of death were never contested.
Small was also qualified to testify as a ballistic expert. Rule 702, Ala. R.Evid., states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Whether a person is qualified to testify as an expert is within the discretion of the trial court, whose ruling will not be disturbed unless there is an abuse of that discretion. See Bailey v. State, 574 So.2d 1001, 1003 (Ala.Crim.App.1990). Challenges to the qualifications of an expert go to the weight, not the admissibility, of the expert's testimony. See Smoot v. State, 520 So.2d 182, 189 (Ala.Crim.App.1987).
Here, Small testified to his training in ballistics. He also testified that he had been conducting such investigations for 12 years before 1977the year of the murders. The trial court did not err in allowing this witness to testify as a pathologist and as a ballistics expert. Small was properly qualified as an expert in all those fields of expertise.

XIV.
Tomlin argues that the prosecutor violated Doyle v. Ohio, 426 U.S. 610, 96 *260 S.Ct. 2240, 49 L.Ed.2d 91 (1976), by questioning him about his postarrest silence.[10] In Doyle, the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. 2240 (footnote omitted).
Tomlin testified that he was not in Alabama at the time of the murders but that he was in Houston, Texas. He stated that on the night of the murders he had gone to several nightclubs. The following then occurred:
"Q [Prosecutor]: So there's not one person in this world that could tell us where you were on the night of January the 1st, except you?
"A: If I was to guess, I probably could find somebody, yes, sir.
"Q: You tell me the name of one police officer that you've told what club you were in on January the 2nd?
"A: One policeman, I didn't tell him nothing, my lawyers advised me not to."
(Emphasis added.) Tomlin argues that the emphasized portion of his testimony violated Doyle v. Ohio.
In Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), we addressed a similar claim. We stated:
"`In Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), the United States Supreme Court "clarified that `the holding of Doyle is that the Due Process Clause bars "the use for impeachment purposes" of a defendant's postarrest silence.'" United States v. Stubbs, 944 F.2d 828, 834 (11th Cir. 1991), quoting Greer, 483 U.S. at 763, 107 S.Ct. at 3108, in turn quoting Doyle, 426 U.S. at 619, 96 S.Ct. at 2245. Furthermore, "while a single comment alone may sometimes constitute a Doyle violation, the Supreme Court's opinion in Greer makes clear that a single mention does not automatically suffice to violate defendant's rights when the government does not specifically and expressly attempt to useas was attempted in Doyle and Greerthe improper comment to impeach the defendant. See Lindgren v. Lane, 925 F.2d 198, 201 (7th Cir.1991)." Stubbs, 944 F.2d at 835. (Emphasis in original.) In Lindgren, supra, the United States Court of Appeals for the Seventh Circuit found as follows: "At trial the prosecutor never called attention to the petitioner's silence. The defendant simply responded that he didn't `wish to say any more' at the tail end of a compound answer to a question by the police officer. Consequently, no Doyle violation occurred." 925 F.2d at 201. See also Mathenia v. Delo, 975 F.2d 444, 452 (8th Cir.1992), cert. denied, 507 U.S. 995, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993) (testimony by officer that defendant did not make a statement to him at the time of his arrest not a comment on defendant's post-arrest silence because the testimony was "`merely preliminary to the admission into evidence of [Mathenia's] videotaped statement'"); Rowan v. Owens, 752 F.2d 1186, 1190 (7th Cir.1984), cert. denied, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 691 (1986) (testimony by officers that defendant stated "he didn't want to say anything else" at conclusion of interrogation not a comment on defendant's post-arrest silence because *261 it simply indicated the end of the interrogation and the testimony was not emphasized so "as to invite the jury to infer that [the defendant] had decided to `clam up' after realizing he was incriminating himself").
"`Our review of the record reveals that the comment by Officer Wilkinson to which the appellant objects was never mentioned or alluded to again at trial by the prosecutor. The statement was not specifically elicited by the prosecutor and appears to be nothing more than part of Officer Wilkinson's narrative of the events leading to the making of the appellant's third taped statement. Clearly, the comment did not constitute an improper comment on the appellant's post-arrest silence for purposes of Doyle.'"
777 So.2d at 823, quoting Wilkerson v. State, 686 So.2d 1266, 1272-73 (Ala.Crim. App.1996).
Tomlin argues in his brief to this Court that "the prosecutor specifically asked Mr. Tomlin why he had not given this alibi to the police after he was arrested." However, our review of the questioning shows that this statement is not supported by the record. Here, as in Whitehead, the statement volunteered by Tomlin was not specifically elicited by the prosecutor. Neither was any undue emphasis placed on Tomlin's answer. In fact, defense counsel mentioned Tomlin's silence in his opening statement. The following occurred:
"You're going to hear one other thing, ladies and gentlemen, and you're gonna hearhear about reading testimony, and you're gonna hear in this case that when Phillip Tomlin was asked, not long after all of this happened if he had anything to do with it. He did the same thing that the President of the United States did when he was asked in that deposition
". . . .
"The evidence will be that he didn't tell the truth about where he was, that he said he was in Houston, said he was stuck in the mud out there, he said Ron Daniels came and got him out of the mud and that's not true, ladies and gentlemen. In fact, what you'll find is that everybody that had anything to do with this case didn't want to admit that they had any part of it."
There was no Doyle violation here. Moreover, given defense counsel's argument in opening, any conceivable error that may have occurred was harmless. See Harris v. State, 611 So.2d 1159 (Ala.Crim.App. 1992).

XV.
Tomlin argues in his brief to this Court that the trial court erred in allowing evidence indicating that "two narcotics officers in March 1976 were engaged in a sting operation against Mr. Tomlin."
The record reflects that Tomlin moved in limine to "exclude any testimony about an investigation and trial for possession of marijuana that resulted in a hung jury in Texas in 1976." In this motion, Tomlin argued:
"At the previous capital trials in 1978 and 1990, two agents from Houston testified that they investigated Mr. Tomlin, tried to purchase one to three pounds of marijuana from him, and charged him with the sale of drugs, but that the jury was hung and the charges were dismissed. This testimony was highly prejudicial and in no way necessary to the trial of Mr. Tomlin."
The trial court granted this motion. Officer Eddie Hebisen, a former employee of the Texas Department of Public Safety, testified that he had a conversation with Tomlin in Houston about one year before *262 the murders. The following occurred during his testimony:
"Q [Prosecutor]: And what were you doing on that day, if you recall?
"A: My role on that particular day was to serve as a back-up for Officer Hammons while he was inside the [Wet and Wild] club.
"Q: Okay. What type of law-enforcement operation were you conducting at the time?
"A: It was an undercover capacity law-enforcement thing.
"Q: And what were your duties, specifically, in relation to Mr. Hammons?
"A: At that time, my duties were to be a back-up for Officer Hammons while he was inside the establishment.
"Q: Okay. Was yourdid Mr. Hammonswas there someone in particular Mr. Hammons was going to see that evening.
"[Defense Counsel]: Objection, same objection we made earlier, Your Honor.
"The Court: Overruled.
"The witness: He was to meet an individual at the bar by the name of Mr. Tomlin, Phillip Wayne Tomlin."
After this exchange, Hebisen testified that he heard Tomlin tell Hammons that he had to go to Alabama to take care of some family business and kill the person who had killed his brother.
Tomlin argues that the above exchange indicated that Tomlin was the subject of a police investigation. There is absolutely no indication from Hebison's testimony that Tomlin was the subject of any investigation nor that he had any prior convictions. Neither was there any reference to what type of law-enforcement agency Hebison worked for. The record does not support Tomlin's contention.

XVI.
Tomlin argues that the trial court erred in allowing prejudicial, cumulative, and gruesome photographs to be received into evidence. He asserts that the admission of those photographs deprived him of his constitutional rights.
We have reviewed the photographs that were admitted at trial. The trial court did not err in admitting these photographs into evidence. As we have stated:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency *263 to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).'"
Travis v. State, 776 So.2d 819, 869 (Ala. Crim.App.1997), aff'd, 776 So.2d 874 (Ala. 2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001), quoting Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).

XVII.
Tomlin argues that the evidence was insufficient to support his conviction and that the trial court erred in denying his motion for a judgment of acquittal.
The facts of the case were discussed in detail at the beginning of this opinion; we will not recite them here. We also noted that the evidence presented at Tomlin's fourth trial did not vary in any great respect from the evidence presented at his previous three trials. In our opinion on Tomlin's appeal from his third conviction, we stated:
"Tomlin contends that the prosecutor presented insufficient evidence to support a guilty verdict. The state's case-in-chief, as it was presented at Tomlin's two previous trials, has been reviewed on appeal several times by this court and the Alabama Supreme Court. See 540 So.2d 668 (Ala.1988), 591 So.2d 550 (Ala.Cr.App.1991), and 443 So.2d 47 (Ala.Cr.App.1979), aff'd, 443 So.2d 59 (Ala.1983). In each of those prior appeals, Tomlin did not question the sufficiency of the evidence. However, those opinions reviewed Tomlin's case under the doctrine of plain error and did not suggest that the prosecution's case was lacking in any way. Notably, in Tomlin, 443 So.2d 47 (Ala.Cr.App.1979), this court reviewed Tomlin's first trial and expressly held that the evidence in that case was sufficient to support Tomlin's conviction. In this trial, the evidence presented was materially indistinguishable from the evidence at the first trial.
"In this third trial, the state's case-in-chief deviated from that of the previous trials in only a few respects.
"1. In this trial, the testimony did not establish that all of the shots that killed Moore and Brune were fired from the back seat of the automobile;
"2. In this trial, the testimony did not establish the brand of .38 caliber gun that inflicted the wounds;
"3. In this trial, the testimony did not establish that Daniels was in fact a `hit man'; however, the testimony did establish that Tomlin represented that he was one.[[11]]
"These minor variations from the evidence presented in Tomlin's prior trials have no material effect on the sufficiency of the evidence presented during the state's case-in-chief. We conclude that in this trial, `even though the evidence is circumstantial, when viewed in a light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every *264 reasonable hypothesis except that of guilt.' Daniels v. State, 534 So.2d 628, 636 (Ala.Cr.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987)."
695 So.2d at 162-63.
There was sufficient evidence on which to submit the case to the jury for its determination. The trial court did not err in denying Tomlin's motion for a judgment of acquittal.

XVIII.
Tomlin argues that the trial court denied him his state and federal constitutional rights to present a full defense by precluding him from presenting habit evidence of Ricky Brune's heroin abuse. Tomlin makes the following argument in brief:
"At Mr. Tomlin's trial, defense counsel called a defense witness, Steve Hensarling. Mr. Hensarling was the former roommate of one of the victims, Ricky Brune. The defense needed Mr. Hensarling to testify as to the victim's habit. Specifically, the defense needed Mr. Hensarling to testify that, when Ricky Brune would go buy heroin, he would habitually take with him a [soft-drink] bottle filled with water, syringes, and other drug paraphernalia. This evidence was crucial to Mr. Tomlin's defense because it proved that Mr. Tomlin was not at the scene of the crime and therefore not guilty of the intentional murder of Cheryl Moore."
During James Steven Heasling's[12] testimony, defense counsel questioned the witness about whether he knew Brune's habits with regard to his drug use. Defense counsel then asked Heasling how much a "pill of heroin cost." After this question, the prosecution objected, stating that this line of questioning was not relevant. Defense counsel then made the following argument:
"Judge, this has denied my client's Constitutional right to present his case, to call witnesses on his own behalf. The State's whole argument in this case is gonna be about how much money these people had on them. They put in all of this evidence about what was in the car. They are gonna argue that my client was there with this other person. My theory of defense that what I'm gonna argue to the jury is that the [soft-drink] bottle, the syringes, and all the paraphernalia that was in the carand this witness can testify, Your Honor, and he told the police officers this within days of the crime in his statement to the policethat that meant that this man was on his way to get drugs, because he never carried any of the paraphernalia, the needles or the bottle or the other things that were in the car. Those would be left elsewhere. That's competent evidence, Your Honor."
There was testimony presented that Brune used heroin. Also, a soft-drink bottle full of water and syringes was recovered from his vehicle. Heasling testified that Brune used these items when he used heroin. Heasling also testified that when he returned to his apartment on the day that Brune was killed, Brune was not there because "he was gone to score some drugs." Tomlin was allowed to present evidence indicating that Brune used heroin.
However, Tomlin did not present evidence indicating that when Brune was carrying *265 his drug paraphernalia he would not go anywhere except to buy drugs. There was no evidence presented at trial indicating that Brune was going to meet Tomlin at the time he was murdered. Neither was an offer of proof or any evidence presented indicating that Heasling was going to testify that when Brune was carrying his drug paraphernalia it was his habit not to go anywhere else. There was absolutely nothing to connect Tomlin's contention that Brune was on his way to buy drugs with his conclusion that this meant that Tomlin could not have been present at the murders. Clearly, this evidence was not relevant because there was no connection established either at trial or argued in Tomlin's brief to this Court.
Relevant evidence is defined in Rule 401, Ala.R.Evid., as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
"The admissibility of evidence that has been challenged as irrelevant and remote in a criminal prosecution is within the sound discretion of the trial judge. Primm v. State, 473 So.2d 1149 (Ala.Cr. App.1985). What is relevant is a matter ordinarily within the discretion of the trial judge, and, unless that discretion is abused, a ruling regarding relevancy will not be considered error. Dawkins v. State, 455 So.2d 220 (Ala.Cr.App.1984); Wicker v. State, 433 So.2d 1190 (Ala.Cr. App.1983)."
Touart v. State, 562 So.2d 625, 629 (Ala. Crim.App.1989). See also Bombailey v. State, 580 So.2d 41 (Ala.Crim.App.1990).

XIX.
Tomlin argues that the prosecutor engaged in misconduct that denied him his right to due process and a fair trial. Tomlin's entire argument in brief on this issue consists of the following:
"Throughout closing argument, the prosecutor made allegations that were entirely unsupported by the evidence. For instance, the prosecutor argued that Mr. Tomlin knew that Ricky Brune had a girlfriend and that `they went around together.' There was absolutely no evidence to that effect. The prosecutor also improperly argued that the death of David Tomlin was accidental. Again, there was no admissible evidence to support that conclusion. The prosecutor also made an improper argument about flight."
Even though Tomlin fails to make any argument concerning these allegations in his brief, because this is a death-penalty case we will review the contentions raised by Tomlin in his brief. See Rule 45A, Ala.R.App.P.
"`The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Cr.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Cr.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Cr.App.1978).'"
Ballard v. State, 767 So.2d 1123, 1135 (Ala. Crim.App.1999), cert. quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980), *266 cert. denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
First, Tomlin stated that the prosecutor engaged in misconduct by arguing that Tomlin knew that Brune had a girlfriend. The prosecutor argued in closing, "I mean, they knew [Brune.] They knew he had a girlfriend. They knew they went around together" When this statement was made, defense counsel objected, stating that there was no evidence to support the statement. The trial court then stated, "The jury heard the evidence and the jury understands that this case will be decided on the evidence from the witness stand and the law that I will instruct you on." It appears that the trial court sustained Tomlin's objection to this argument. Moreover, this is a legitimate inference that could be drawn from the testimony. There was testimony that David Tomlin and Brune were friends and that Brune was even one of the pallbearers at David Tomlin's funeral. Certainly, this evidence would tend to imply that Brune was known to the Tomlin family.
Tomlin also states that the prosecutor erred in arguing that David Tomlin's death was an accident when there was "no admissible evidence" to support this statement. Tomlin himself testified that David Tomlin's death was an accident. Also, Officer Henton testified that the police had ruled David Tomlin's death an accident. This was a proper argument based on the evidence presented at trial.
Tomlin last states that the prosecutor improperly argued flight evidence. We note that there was no objection to any flight argument made until after all of the arguments had been made. Moreover, Tomlin failed to identify what he considered to be an argument on flight. We have reviewed the opening statement, and we find no reference to any flight evidence. The only reference made was that Tomlin flew from Houston to New Orleans. There was no plain error here.

XX.
Tomlin challenges several of the trial court's jury instructions and the trial court's failure to instruct the jury on certain lesser-included offenses.
"When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). `The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice.' Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."
Johnson v. State, 820 So.2d 842, 874 (Ala. Crim.App.2000).

A.
Tomlin argues that the trial court erroneously instructed the jury on premeditation, deliberation, and malice. He asserts that there was no need to instruct on these elements and doing so only confused the jury and lowered the State's burden of proof.
Tomlin was indicted and convicted of violating § 13-11-2(a)(10), Ala.Code 1975 (superseded). That section read:
"Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts."
Murder in the first degree was defined in § 13-1-70 (superseded). This section stated:
"Every homicide perpetrated by poison, lying in wait or any other kind of *267 wilful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree; and every other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree."
(Emphasis added.)
The indictment returned against Tomlin charged:
"The Grand Jury of said County charge, that, before the finding of this indictment Phillip Wayne Tomlin whose name is to the Grand Jury otherwise unknown than as stated, did by one act or a series of acts, unlawfully, intentionally, and with malice aforethought, kill Richard Brune by shooting him with a gun, and unlawfully, intentionally, and with malice aforethought, kill Cheryl Moore by shooting her with a gun, in violation of Code of Alabama 1975, § 13-11-2(10), against the peace and dignity of the State of Alabama."[13]
Under the statute pursuant to which Tomlin was charged the murder must be "wilful, deliberate, malicious and premeditated." See Young v. State, 428 So.2d 155 (Ala.Crim.App.1982); Sanders v. State, 392 So.2d 1280 (Ala.Crim.App.1980); Carey v. State, 361 So.2d 1176 (Ala.Crim.App.1978), cert. denied, 374 So.2d 332 (Ala.1979). The trial court's jury instructions on premeditation, deliberation, and malice were consistent with the law and accurate accounts of the law at the time that the murders were committed. No error occurred here.

B.
Tomlin argues that the trial court's jury instruction on reasonable doubt was flawed because the court used the term "moral certainty." He contends that the trial court's instruction violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
In Reeves v. State, 807 So.2d 18 (Ala. Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), we stated:
"It is well settled that `[t]he Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."' Knotts v. State, 686 So.2d 431, 459 (Ala.Crim. App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], the United States Supreme Court held that an instruction that equated `reasonable *268 doubt' with `grave uncertainty,' and `actual substantial doubt' and stated that what was required to convict was a `moral certainty,' could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), `the Court "made it clear that the proper inquiry is not whether the instructing `could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it."' Knotts, 686 So.2d at 459, quoting Victor, 511 U.S. at 6, 114 S.Ct. 1239 at 1243, 127 L.Ed.2d 583 quoting, in turn, Estelle v. McGuire, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is `whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard.' Victor, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in Victor `that, while it did not condone the use of the Cage terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if "`taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.'"' Lawhorn v. State, 756 So.2d 971, 985 (Ala.Crim.App.1999), quoting Victor, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See also Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (`"Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error."'); and Sockwell v. State, 675 So.2d 4, 23 (Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996) (`It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage.' (Emphasis added [in Reeves].)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of `reasonable doubt' was correctly conveyed to the jury, we will not find error. See, e.g., Knotts, supra."
807 So.2d at 40-41.
The trial court gave the following instruction on reasonable doubt:
"A reasonable doubt means simply what it says. It's a doubt for which a reason can be given. It is not merely a guess or a surmise. A reasonable doubt may arise from all of the evidence or from a lack of the evidence or from any part of the evidence. The State of Alabama is not required to prove the guilt of the Defendant, beyond all doubt, but beyond all reasonable doubt. If, after comparing and considering all of the evidence in the case, you can say that you have an abiding conviction to a moral certainty of the truth of the charge, then you are convinced, beyond a reasonable doubt, and your duty is to convict the Defendant. If you cannot say that, your duty is to acquit him."
Initially, we observe that Tomlin did not object to the trial court's jury instruction on reasonable doubt. Therefore, we are confined to determining whether there was *269 plain error in the court's instruction. Rule 45A, Ala.R.App.P.
"The use of the term `moral certainty' alone in defining reasonable doubt did not create the error defined and discussed in Cage v. Louisiana, [498 U.S. 39 (1990)]; rather, it was the use of this term in conjunction with other terms, such as `grave uncertainty' and `actual substantial doubt,' that served to lessen the burden of proof."
Price v. State, 725 So.2d 1003, 1021 (Ala. Crim.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). See also Boyd v. State, 715 So.2d 825, 843 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998) ("mere use of the term `moral certainty' did not make the charge unconstitutional under Cage").
"The trial court repeatedly emphasized that the burden was on the State to prove Ferguson's guilt beyond a reasonable doubt; that a reasonable doubt could arise from the evidence or from a lack of evidence; and that the jury must acquit Ferguson if the State failed to prove each and every element of the capital offense ... beyond a reasonable doubt. The instruction did not decrease or shift the State's burden of proof."
Ferguson v. State, 814 So.2d 925, 955 (Ala. Crim.App.2000).

C.
Tomlin argues that the trial court erred in allegedly instructing the jury numerous times on the doctrine of accomplice liability.
Tomlin did not object to the trial court's instruction on accomplice liability; therefore, we look for plain error. See Rule 45A, Ala.R.App.P.
We have reviewed the trial court's instruction on accomplice liability. The trial court initially gave an instruction on accomplice liability and then explained that the phrase "aids and abets" may encompass "acts or words of encouragement or support, actual or constructive." There was no repetition of any accomplice-liability instruction.
Moreover, the trial court gave the following instruction:
"Ladies and gentlemen, I mayI may, during the charge to you, give you one instruction that is similar to or identical to another charge. It is not that I intend to give emphasis to that particular instruction or charge, it's simply they do come from different sources and I may very well repeat one."
There is no plain error here.

D.
Tomlin argues that the trial court improperly reinstructed the jury on particularized intent.
The record reflects that, after the jury had begun deliberations, it returned with two questions related to intent. The jury requested the definition of particular intent and asked whether you can transfer a particular specific intent from one person to another. The trial court and the attorneys then discussed what portions of the jury charge that the trial court would repeat to the jury.
On appeal, Tomlin argues that the trial court's reinstruction on particularized intent was improper and erroneous. He fails to state in what way the instruction was improper or erroneous.
After Tomlin's second trial and conviction we addressed the trial court's failure to instruct the jury on the requirement of a particularized intent to kill. See Tomlin, 591 So.2d at 557. In accordance with our *270 holding in the prior appeal, the trial court in Tomlin's fourth trial gave very thorough and accurate instructions on the intent to kill. There was no plain error in the trial court's instructions on intent.

E.
Tomlin argues that the trial court erred in failing to give lesser-included offense instructions on murder with extreme indifference to human life and on manslaughter. Tomlin does not state what evidence in the record brought the murders within the definition of the offense of murder with extreme indifference to human life or manslaughter. Tomlin's entire argument on this issue consists of one paragraph in his brief to this Court.
The Alabama Supreme Court addressed this issue in this case on application for rehearing in the appeal of the first conviction. The Supreme Court stated:
"While Tomlin's petition for writ of certiorari was pending before this court, the United States Supreme Court handed down Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in which it found Alabama's 1975 death penalty statute defective because the preclusion clause in the act prohibited juries from considering any lesser included offenses. Because we interpreted Beck v. Alabama to require that all defendants theretofore convicted under that statute be granted new trials, we entered an order reversing Tomlin's conviction.
"The State filed an application for rehearing in which it asked us to reconsider our interpretation of Beck v. Alabama. While the application for rehearing was pending, the Supreme Court released its opinion in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Evans had been convicted and sentenced to death after testifying that he intentionally shot the proprietor of a pawnshop during a robbery. Because Evans suggested no plausible claim not contradicted by his own testimony at trial which would entitle him to a jury instruction on a lesser included offense, the Court ruled that he had not been prejudiced by the preclusion clause. It concluded, therefore, that Evans was not entitled to a new trial. Hopper, supra, 456 U.S. at 613-14, 102 S.Ct. at 2054. We hereby withdraw our previous opinion in this case in order to enter an order in accordance with Hopper and its progeny.
"A defendant convicted under § 13-11-2 of the 1975 statute is entitled to a new trial because of the preclusion clause in the statute if there was evidence introduced at trial which would have warranted a jury instruction on a lesser included offense or if the defendant suggests any plausible claim not contradicted by his own testimony which he might conceivably have made which would have entitled him to a jury instruction on a lesser included offense. Cook v. State, 431 So.2d 1322, 1324 (Ala. 1983).
"Tomlin testified that he was in Texas at the time of the killings. We examined in Cook v. State, supra, the effect of an alibi defense on the question of whether a defendant convicted under the 1975 death penalty statute is entitled to a new trial because of the preclusion clause. We concluded that when a defendant testified that he was in a distant location when the crime was committed, his own testimony directly contradicted any evidence he might have introduced to show that he was guilty of a lesser included offense. Cook, supra, at 1325."
Tomlin, 443 So.2d at 61-62.
Tomlin argues that he was entitled to an instruction on murder with extreme *271 indifference to human life. This tracks the current murder statute found in § 13A-6-2(a)(2), "Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." However, in 1977, at the time of the murders, Alabama had degrees of murder and manslaughter.
"Murder is the unlawful killing of a human being with malice aforethought. Hornsby v. State, 16 Ala.App. 89, 75 So. 637 (1917). In Alabama, murder in the first degree is divided into four classes according to mental intent. Mitchell v. State, 60 Ala. 26 (1877). Title 14, Section 314, Code of Alabama 1940 lists the four classes of first degree murder: (1) Premeditated intent-to-kill murder; (2) murder in the commission of certain enumerated felonies; (3) murder of an unintended victim where the intent was to kill another; and (4) depraved mind or heart murder sometimes referred to as murder resulting from universal malice."
Napier v. State, 357 So.2d 1001, 1007 (Ala. Crim.App.1977), rev'd, 357 So.2d 1011 (Ala. 1978) (judgment was reversed because State had not proved prima facie case). The argument Tomlin makes about extreme indifference to human life is similar to the prior offense of universal malice murder in the first degree. However, there was absolutely no evidence indicating that the murders fit within this definition. This Court in Napier discussed the types of murder that constitute universal malice. The Court stated:
"Typical illustrations of the doctrine of universal malice are wilfully riding an unruly horse into a crowd, and throwing a timber from a roof into a crowded street. Moore v. State, 18 Ala. 532 (1851). Other examples are shooting a firearm into a crowd or into a train, dwelling house or automobile containing occupants. Bailey v. State, 133 Ala. 155, 32 So. 57 (1901); Johnson v. State, 203 Ala. 30, 81 So. 820 (1919); Washington v. State, 60 Ala. 10, 31 Am.Rep. 28 (1877); see also Gallant v. State, 167 Ala. 60, 52 So. 739 (1910) (setting off explosion beneath a house); Presley v. State, 59 Ala. 98 (1877)(placing obstacles on railroad track); Langford v. State, Ala.Cr.App.1977, 354 So.2d 297 (driving an automobile in a grossly wanton manner)."
357 So.2d at 1007.
Here, the evidence established that the two victims were killed by gunshot wounds fired at close range. The toxicologist testified that at least two shots were fired from the backseat of the car. Moore was also shot with a shotgun after she got out of the car. All of the bullets except the shotgun wound were made from the same.38 caliber gun. There was absolutely no evidence that the murders fit within the "universal malice" definition of first-degree murder.
Tomlin further argues, without any reference to facts in the record, that the trial court erred in failing to give a jury instruction on manslaughter. At the time of the killings, the Alabama Code set out two degrees of manslaughter. The manslaughter statute, § 13-1-90, Ala.Code 1975 (superseded), stated:
"Manslaughter by voluntarily depriving a human being of life is manslaughter in the first degree; and manslaughter committed under any other circumstances is manslaughter in the second degree."
We are assuming that Tomlin is arguing that the trial court erred in failing to give a jury instruction on manslaughter in the first degree. Tomlin has not cited at trial *272 nor in his brief to this Court any facts that would bring the homicides within the definition of manslaughter. Certainly, the record fails to show any evidence indicating that the murders were anything but intentional. The trial court did not err in failing to give these lesser-included offense instructions.

XXI.
Tomlin argues that the cumulative effect of the alleged errors denied him a fair trial. "Because we find no error in the specific instances alleged by the appellant, we find no cumulative error." McGriff v. State, 908 So.2d 961, 1002 (Ala.Crim.App. 2000).

Penalty-Phase Issues

XXII.
Tomlin argues that his sentence of death, after he has been on death row for more than 22 years, results in cruel and unusual punishment and violates international law. This issue has been addressed by this Court in Pierce v. State, 851 So.2d 558 (Ala.Crim.App.1999), where this Court quoted from the Alabama Supreme Court's decision in Ex parte Bush, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
"`Bush makes several "plain error" arguments that neither the trial court nor the Court of Criminal Appeals addressed; only one of those calls for any discussion here. That argument is that Bush's incarceration for 16 years awaiting the execution of his death sentence constitutes cruel and unusual punishment prohibited by the Eighth Amendment of the United States Constitution.
"`Bush relies primarily upon Lackey v. Scott, 885 F.Supp. 958 (W.D.Tex. 1995), a case in which an inmate claimed that his lengthy incarceration on death row constituted cruel and unusual punishment. There, the federal district court stayed the execution in order to address the issue, but the Fifth Circuit Court of Appeals vacated the stay, holding that this particular claim was barred. See Lackey v. Scott, 52 F.3d 98 (5th Cir.1995). On Lackey's petition, the Supreme Court issued a per curiam order granting a stay of execution "pending the district court's consideration of petitioner's petition for a writ of habeas corpus." Lackey v. Scott, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). The district court, based upon Fearance v. Scott, 56 F.3d 633 (5th Cir.), cert. denied, 515 U.S. 1153, 115 S.Ct. 2603, 132 L.Ed.2d 847 (1995) (which held that the legal theory underlying a Lackey claim is not novel and thus does not meet the novelty exception to the abuse-of-the-writ doctrine), dismissed Lackey's claim as an abuse of the writ. See 83 F.3d at 117. On appeal, the Fifth Circuit affirmed, holding that "Lackey's claim ... fails on the merits, because White [v. Johnson, 79 F.3d 432 (5th Cir.1996), cert. denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996)], holds that inordinate delay in carrying out an execution does not violate the prisoner's Eighth Amendment rights. Id. at 439." Lackey v. Johnson, 83 F.3d 116, 117 (5th Cir.), cert. denied, [519] U.S. [911], 117 S.Ct. 276, 136 L.Ed.2d 198 (1996).
"`Nevertheless, the same issue has also been addressed by the Ninth Circuit Court of Appeals in McKenzie v. Day, 57 F.3d 1461 (9th Cir.), cert. denied, 514 U.S. 1104, 115 S.Ct. 1840, 131 L.Ed.2d 846 (1995), where McKenzie, the petitioner, argued that a 20-year delay in the execution of his death sentence amounted to cruel, unusual, and arbitrary punishment. The Ninth Circuit stated:
"`"`A defendant must not be penalized for pursuing his constitutional *273 rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights. It would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place. If that were the law, death-row inmates would be able to avoid their sentences simply by delaying proceedings beyond some threshold amount of time, while other death-row inmates  less successful in their attempts to delaywould be forced to face their sentences. Such differential treatment would be far more "arbitrary and unfair" and "cruel and unusual" than the current system of fulfilling sentences when the last in the line of appeals fails on the merits. We thus decline to recognize Richmond's lengthy incarceration on death row during the pendency of his appeals as substantively and independently violative of the Constitution.'
"`"[Richmond v. Lewis,] 948 F.2d [1473,] at 1491-92 [(9th Cir.1990)].
"`". . . .
"`". . . The delay has been caused by the fact that McKenzie has availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances. That this differs from the practice at common law, where executions could be carried out on the dawn following the pronouncement of sentence, see [Pratt & Morgan v. Attorney General for Jamaica, 3 S.L.R. 995, 2 A.C. 1, 4 All E.R. 769 (Privy Council 1993),] is a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences. Indeed, most of these procedural safeguards have been imposed by the Supreme Court in recognition of the fact that the common law practice of imposing swift and certain executions could result in arbitrariness and error in carrying out the death penalty. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We cannot conclude that delays caused by satisfying the Eighth Amendment themselves violate it.
"`"We are also mindful that sustaining McKenzie's claim would dramatically alter the calculus in granting stays of execution in the hundreds of death penalty cases now pending before the state and federal courts. By and large, courts have erred on the side of caution in granting stays of execution sought by death row inmates. While the resulting delay may undermine the state's interest in carrying out its sentence expeditiously, see In re Blodgett, 502 U.S. 236, 112 S.Ct. 674, 116 L.Ed.2d 669 (1992), death row inmates have generally been successful in arguing that stays of execution should be freely granted because the state's interest in carrying out its sentence will not be permanently impaired. This argument would lose much of its force in a regime where the state risks being pushed permanently out of bounds if the execution is too long deferred by the process of adjudication. By and large, the delay in carrying out death sentences has been of benefit to death row inmates, allowing them to extend their lives, obtain commutation or reversal *274 of their sentences or, in rare cases, secure complete exoneration. Sustaining a claim such as McKenzie's would, we fear, wreak havoc with the orderly administration of the death penalty in this country by placing a substantial premium on speed rather than accuracy.
"`". . . .
"`". . . McKenzie nevertheless argues that we have an obligation to enter a stay because the Supreme Court recently entered a stay in Lackey to allow the district court in that case to consider whether inordinate delay in carrying out the sentence of death constitutes cruel and unusual punishment. Lackey v. Scott, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). McKenzie argues that the Supreme Court's stay in Lackey is a signal that the inferior federal courts must enter stays of execution in all cases raising colorable Lackey claims.
"`"... Finally, we read the Supreme Court's laconic stay in Lackey as an indication that the justices wish to see the matter explored in cases where it is properly raised, not as a ruling that stays must be entered in all cases raising Lackey claims in disregard of all other equitable considerations....
"`". . . When considered in light of what we see as a low probability of ultimate success on the merits of McKenzie's Lackey claim, we find no basis for exercising our equitable discretion in issuing a stay."
"`57 F.3d at 1466-69. In its note 16, the McKenzie court stated:
"`"Indeed, at least two other prisoners have been executed recently even though they raised potentially meritorious Lackey claims on the eve of their executions. See Free v. Peters, 50 F.3d 1362 (7th Cir.), cert. denied, 514 U.S. 1034, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995); Williams v. Chrans, 50 F.3d 1363 (7th Cir.1995)."
"`57 F.3d at 1468.
"`Based on the foregoing, we find no merit in Bush's argument that the same constitutional protections that have kept him from being executed for the past 16 years are simultaneously violating his constitutional rights.'
"695 So.2d at 139-40. We agree with the reasoning set out in Ex parte Bush and the cases cited therein, and we reject the appellant's argument."
851 So.2d at 590-92. For the reasons stated in Pierce and Bush, we likewise reject Tomlin's claim.

Trial Court's Sentencing Order

XXIII.
Tomlin argues that the trial court improperly overrode the jury's recommendation of life imprisonment without the possibility of parole. He makes several arguments in support of this contention.

A.
Tomlin initially argues that the trial court failed to find any aggravating circumstances or any mitigating circumstances and likewise failed to make written findings of fact.
On motion of the State, before the submission of this case, we remanded the case to the circuit court for that court to file a written sentencing order that made specific findings of fact and that addressed the aggravating circumstances and the mitigating circumstances. The trial court complied with our instructions. This action has rendered this claim moot.

*275 B.
Tomlin also argues that the trial court was without statutory authority to override the jury's recommendation in this case. Specifically, he contends that the old death-penalty statute did not give a trial court the authority to override a jury's recommendation of life imprisonment without the possibility of parole.
This issue was previously addressed by our Supreme Court in Ex parte Hays, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). In Hays, the Supreme Court stated:
"Although we did not address the issue of the trial judge's authority to override the jury's recommendation of a sentence of life without parole in Beck [v. State, 396 So.2d 645 (Ala.1980)], we are of the opinion that this authority is implied as a necessary and logical consequence of our holding in that case. It is conceded that the death penalty statute made no express provision for the trial judge to override the jury's recommendation of life imprisonment. Code 1975, § 13-11-3, provided in part:
"`If the jury finds that the defendant guilty of one of the aggravated offenses listed in section 13-11-2 and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole.'
"Additionally, Code 1975, § 13-11-4, provided in part:
"`Notwithstanding the fixing of the punishment at death by the jury, the court, after weighing the aggravating and mitigating circumstances, may refuse to accept the death penalty as fixed by the jury and sentence the defendant to life imprisonment without parole, which shall be served without parole; or the court, after weighing the aggravating and mitigating circumstances, and the fixing of the punishment at death by the jury, may accordingly sentence the defendant to death.'
"The statutory provisions only expressly allow the trial judge to override the jury's sentence if the jury imposes a sentence of death. However, it was unnecessary for the legislature to include a provision in the statute allowing the trial judge to override the jury's recommended sentence of life without parole because, prior to this Court's decision in Beck, the jury was absolutely prohibited from imposing a sentence of life without parole. The legislature did expressly empower the trial judge to override the only sentence the jury was authorized to recommend under the statute: death.
"We are also mindful that after our decision in Beck, the legislature adopted a new death penalty statute which expressly allows the jury to recommend either a sentence of death or a sentence of life without parole. Under this new statutory scheme, the trial judge is given express authority to override the jury's recommendation of death or of life without parole. See Code 1975, § 13A-5-47.
"Both the old and the new death penalty statutes clearly embody the principle that the judge is the final sentencing authority and may, therefore, override the recommendation by the jury. Although our decision in Beck has been construed to have altered the sentencing autonomy of the trial judge if the jury renders a sentence of life without parole, see J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala. L.Rev. 213, 324 (1982), this result was not our intention in Beck. In order to uphold the legislative intent expressed in the old death *276 statute that the judge be empowered to override the only sentence that could be recommended by the jury, we hold that the trial court is empowered to override the jury's sentence recommendation of life without parole which we judicially grafted onto the old death statute as an alternate sentence recommendation. We are of the opinion that our holding in the instant case is supported by the United States Supreme Court's decision in Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In Dobbert, the Supreme Court held that there is no ex post facto violation of Article I, § 10, of the Constitution by sentencing a defendant to death under a statutory sentencing scheme in effect at the time of the defendant's trial, but not in effect at the time the crime was committed, which allowed the trial court judge to override a jury's sentencing recommendation of life imprisonment, although the trial court judge had no authority under the statutory sentencing scheme in effect at the time of the commission of the crime (which provided that the death penalty was mandatory unless a majority of the jury recommended mercy) to override the jury's sentence of life imprisonment. In rejecting the Constitutional challenge to the application of the new sentencing scheme, the Dobbert court stated:
"`[T]he change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.'
"432 U.S. at 293-94, 97 S.Ct. at 2298.
"Our decision in Beck v. State, altered the procedures by which the sentence was imposed under the old Alabama death penalty statute, just as the Florida legislature altered the sentencing procedure under Florida law by enacting the new death penalty statute at issue in Dobbert. Our holding in the instant case, interpreting our decision in Beck v. State as allowing for the trial court judge to override the jury's recommendation of life imprisonment, comports with constitutional requirements generally, and is constitutional as applied specifically to Hays in this case.
"Additionally, the allowance of the trial judge's override insures that the death penalty is not imposed in a wanton or freakish manner. Indeed, the Supreme Court has held that `Appellate review of death cases is required to make sure that the death penalty will not be wantonly or freakishly imposed.' Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)."
518 So.2d at 775-76.
Tomlin also argues that the Supreme Court's decision in Beck v. State, 396 So.2d 645 (Ala.1980), unconstitutionally violated the doctrine of separation of powers. Specifically, he contends that the Supreme Court redrafted the old death-penalty statute in Beck  an action that usurped the Legislature's jurisdiction. We specifically addressed this issue in Magwood v. State, 494 So.2d 124, 150 (Ala. Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), and stated:
"Appellant further contends that the procedural changes made by the Alabama Supreme Court in the method of sentencing one convicted of a capital offense from those specifically provided by statute constitutes an unconstitutional usurpation of legislative authority and violates the doctrine of separation of powers guaranteed by the federal and state constitutions. The Supreme Court decided this issue in Beck v. State, holding *277 that, under the separation of powers doctrine, it could not change the offense, but that a change in procedure to comport with constitutional requirements was not impermissible. Beck, 396 So.2d at 662. In Clisby v. State, 456 So.2d 95 (Ala.1983), aff'g 456 So.2d 86 (Ala.Crim. App.[1982]), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985), the court held that all actions taken by the Alabama Supreme Court in Beck v. State were constitutional. Beck v. State, 485 So.2d 1207 (Ala.1985). See also Raines v. State, 429 So.2d 1111 (Ala. 1982); Colley v. State, 436 So.2d 11 (Ala. Crim.App.1983)."

C.
Tomlin argues that the application of the Alabama Supreme Court's procedures established in Beck v. State to his case violates the prohibition against ex post facto laws. The Alabama Supreme Court addressed this issue in Potts v. State, 426 So.2d 896, 900 (Ala.1983), where the court stated,
"The appellant's argument that applying in his trial the procedures we set forth in Beck v. State, 396 So.2d 645 (Ala. 1980), violated the ex post facto clause of the United States Constitution is without merit. The United States Supreme Court in an analogous decision involving Florida's death penalty statute, found no violation of the ex post facto clause existed. See Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)."

D.
Tomlin argues that judicial override under the old death-penalty statute is arbitrary and capricious. This issue was addressed in Daniels v. State, 534 So.2d 628 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987). In Daniels we stated:
"Daniels's final assertion of unconstitutionality of the sentencing scheme of the 1975 Act  that the statute provides no procedures or standards safeguarding against arbitrary and capricious sentences of death  is likewise without merit. Section 13-11-3 requires that upon a jury's verdict of guilty, the trial court must hold a separate hearing to aid it in determining whether to impose the sentence of death or of life imprisonment without parole. It further provides that any relevant evidence may be presented and that evidence relating to the enumerated aggravating and the mitigating circumstances must be presented. Section 13-11-4 provides that the court shall impose the appropriate sentence only after weighing the aggravating and mitigating circumstances and that, in the event the court imposes the death penalty, it shall set forth in writing its findings of fact, which shall include the enumerated aggravating circumstances and the mitigating circumstances that formed the basis for the sentence. These procedures afford a constitutional sentencing scheme which is in nowise tainted by arbitrariness or capriciousness; the provisions for the separate proceeding allow and require focus on the circumstances of the particular offense and the character of the defendant, thus channeling the sentencing authority's discretion. Ritter v. State, 429 So.2d 928, 936-37 (Ala.1983). See also Jacobs v. State, 361 So.2d 607, 628-34 (Ala.Cr.App.1977), aff'd 361 So.2d 640 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979)."
534 So.2d at 645.

E.
Tomlin last argues that death by electrocution is cruel and unusual punishment *278 in violation of the Eighth Amendment to the United States Constitution. This issue is now moot. Recently, the Legislature passed Act No. 2002-492, Ala. Acts 2002, which will become effective on July 1, 2002. This Act changes the primary method of execution from the electric chair to lethal injection. The Act, in part, amends § 15-18-1, Ala.Code 1975, to provide that "A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." This Act applies to all persons currently on Alabama's death row.

Appellate Review

XXIV.
Last, we will address the propriety of Tomlin's conviction and his sentence to death. Tomlin was tried and convicted under the former death-penalty statute, § 13-11-1, Ala.Code 1975 (superseded). At that time, there was no provision similar to § 13A-5-53, Ala.Code 1975, that addresses the requirements for evaluating the propriety of a death sentence. However, the Alabama Supreme Court in Beck v. State, 396 So.2d 645 (Ala.1980), stated the following about appellate review of death-penalty cases:
"To insure that sentences of death will not be arbitrarily and capriciously imposed, we hold that both the Court of Criminal Appeals and this Court should examine all death sentences in light of the standards and procedure approved in Gregg [v. Georgia, 428 U.S. 153 (1976)]. Each death sentence should be reviewed to ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant. In making this final determination, the courts should examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any."
396 So.2d at 664. Current § 13A-5-53, was patterned after the United States Supreme Court's decision in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), so we have evaluated the propriety of Tomlin's death sentence using the factors articulated in § 13A-5-53.
The record reflects that Tomlin's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
Tomlin was indicted for, and convicted of, killing two or more people during one course of conduct, a violation of § 13-11-2(a)(10), Ala.Code 1975 (superseded). This offense is punishable by death. This offense is now defined as a capital offense in § 13A-5-40(a)(10), Ala.Code 1975.
The trial court's sentencing order reflects that the trial court correctly weighed the aggravating circumstance and the mitigating circumstances and determined that death was the appropriate sentence for Tomlin. The trial court found that one aggravating circumstance was present, and stated the following:
"The only aggravating circumstance the Court finds to exist in this case is the one contained in the definition of the capital offense itself: that the defendant, Phillip Wayne Tomlin, committed murder in the first degree wherein two human beings were intentionally killed by the defendant by a series of acts."
Tomlin argues that the trial court erred in finding the double homicide to be an aggravating circumstance because this was not defined as an aggravating circumstance in § 13-11-6. Section 13-11-6 read as follows:

*279 "Aggravating circumstances shall be the following:
"(1) The capital felony was committed by a person under sentence of imprisonment;
"(2) The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person;
"(3) The defendant knowingly created a great risk of death to many persons;
"(4) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnaping for ransom;
"(5) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
"(6) The capital felony was committed for pecuniary gain;
"(7) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or
"(8) The capital felony was especially heinous, atrocious or cruel."
The Alabama Supreme Court has addressed this same issue and stated the following in Beck v. State:
"In Alabama, the aggravating circumstances constitute an element of the capital offense and are required to be `averred in the indictment' (Code 1975, § 13-11-2), and must be proved beyond a reasonable doubt. Consequently, the jury verdict that the defendant was guilty of committing the capital offense would mean that the State had already established at least one aggravating circumstance, even though the legislature did not include an aggravating circumstance in § 13-11-6 to correspond with the `aggravation' made a part of each capital offense by § 13-11-2(a)."
396 So.2d at 663. The trial court correctly found that the double homicide was an aggravating circumstance.
The trial court found no statutory mitigating circumstances. At the time the statutory mitigating circumstances were defined in § 13-11-7. This section read:
"Mitigating circumstances shall be the following:
"(1) The defendant has no significant history of prior criminal activity;
"(2) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
"(3) The victim was a participant in the defendant's conduct or consented to the act;
"(4) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
"(5) The defendant acted under extreme duress or under the substantial domination of another person;
"(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
"(7) The age of the defendant at the time of the crime."
The trial court stated the following about the nonstatutory mitigating circumstances:
"As to nonstatutory mitigating circumstances, the Court finds that the defendant has been a model prisoner since incarcerated and has attempted to improve himself spiritually and educationally. The Court further finds that *280 the defendant has no significant history of violent behavior nor an apparent reputation for such. (The pre-sentence investigation report of October 26, 1978, does reflect one incident). The Court further finds that the defendant has been a source of parental support for his children."
The trial court weighed the aggravating circumstances and the mitigating circumstances, considered the jury's recommendation of life imprisonment without the possibility of parole, and sentenced Tomlin to death by electrocution. The trial court stated the following:
"The Court has carefully, and at length, reviewed the aggravating circumstances and the statutory and nonstatutory mitigating circumstances and has given serious consideration to the unanimous recommendation of the jury for life without parole and the evidence received by the jury at the hearing.
"The other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first-degree murder of the same two people and sentenced to death. This Court is charged with the duty to ensure that the death penalty is not imposed in a freakish, arbitrary, wanton, or capricious manner. That is the reason this Court has the authority to reject a jury's recommendation of death and impose life without parole and conversely the authority to reject a jury's recommendation of life without parole and impose death, if by doing either the Court prevents such prohibited imposition.
"In light of the peculiar circumstances in this case with regard to this defendant, this Court is of the opinion that the acceptance of the jury's recommendation would be wrong.
"For our judicial system to say, under the circumstances of this case, that the hit man should be sentenced to death but that the hirer, the planner, the cold avenger and the co-executioner should be sentenced to life without parole is an aberration; a freak that cannot be allowed."[14]
However, pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Tomlin's sentence to death. This Court is convinced, after an independent weighing, that Tomlin's sentence to death is appropriate. The record shows that the murders were committed in a cold, calculated, and premeditated fashion and we are convinced that death is the appropriate punishment for Tomlin's conduct.
Neither was Tomlin's sentence disproportionate or excessive when compared to penalties imposed in similar cases. See Daniels v. State, 534 So.2d 628 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).
Last, we have searched the record for any error that may have adversely affected Tomlin's substantial rights and have found none. See Rule 45A, Ala. R.App.P.
Tomlin's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.[15]

*281 On Application for Rehearing

MCMILLAN, Presiding Judge.
The appellant, Phillip Wayne Tomlin, was convicted of capital murder and was sentenced to death for killing two people during one course of conduct. We affirmed Tomlin's conviction and sentence. See Tomlin v. State, 909 So.2d 213 (Ala.Crim.App.2002). While this case was pending on rehearing, the United States Supreme Court released its decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Ring, the court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases. The United States Supreme Court held that any fact that increased a defendant's punishment to death had to be presented to a jury and proven beyond a reasonable doubt.
After Ring was released, we allowed the State and Tomlin an opportunity to file supplemental briefs addressing the effect of the Ring decision on this appeal.[1]
Tomlin argues that because "the factfindings necessary to support the imposition of the death penalty in this case were never made by a jury, Mr. Tomlin must now be sentenced to life [imprisonment] without parole." (Tomlin's supplemental brief, page 16.)
The defendant in Ring was convicted of felony murder. The crime for which the jury convicted Ring was not a crime punishable by death under Arizona law. However, Arizona's statutory scheme allowed a trial court to make additional fact-findings that could increase a sentence to death. The trial court considered testimony from one of Ring's codefendants. This testimony resulted in the trial court's imposing a death sentence in Ring's case. The United States Supreme Court held that Arizona's statutory scheme was unconstitutional. The holding in Ring, however, was narrow. The Court did not address whether all judicial sentencing in a capital case is constitutional or whether judicial override is constitutional. 536 U.S. at 597, 122 S.Ct. at 2437 n. 4. The Court also left to the individual states the determination whether any violation of Ring could be harmless.
This case is not affected by the holdings in Ring or Apprendi. Here, Tomlin was convicted of the capital offense of killing two or more people during one course of conduct. See § 13-11-2(a)(10), Ala.Code 1975 (repealed; now codified at § 13A-5-40(a)(10)). Under the old death-penalty statute, killing two or more persons was an aggravating circumstance  the only aggravating circumstance found in this case. See Beck v. State, supra.[2] Therefore, the *282 jury's verdict in the guilt phase established the aggravating circumstance that made Tomlin eligible for death under Alabama law. There was no Ring violation here.
Our view is consistent with at least one other state that has had the opportunity to address this issue. As the Supreme Court of Indiana stated in Wrinkles v. State, 776 N.E.2d 905, 907-08 (Ind.2002):
"The Court need not decide whether Ring applies retroactively or whether some aspects of Indiana's death penalty scheme are affected by Ring, because Ring is not implicated in petitioner's case under any view that the Court might find plausible. The aggravating circumstance that made petitioner eligible for a death sentence was that he had committed multiple murders. See I.C. § 35-50-2-9(b)(8). The jury's verdict in the guilt phase, finding petitioner guilty of the three murders, necessarily means that the jury found, beyond a reasonable doubt, that petitioner had committed more than one murder."
Tomlin also argues that federal law should now condemn the imposition of the death penalty by a judge rather than by a jury. However, as the Ring court noted:
"Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. . . . Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion)."
536 U.S. at 597, 122 S.Ct. at 2437 n. 4.
The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975  commonly referred to as the judicial-override statute  against constitutional attack. In Harris, the United States Supreme Court stated:
"Alabama's capital sentencing scheme is much like that of Florida. Both require jury participation in the sentencing process but give ultimate sentencing authority to the trial judge. Ala.Code § 13A-5-47(e) (1994); Fla. Stat. § 921.141(3) (1985) . . . . In Florida, as in Alabama, the reviewing courts must independently weigh aggravating and mitigating circumstances to determine the propriety of the death sentence, Ala.Code § 13A-5-53(b)(2) (1994); Harvard v. State, 375 So.2d 833 (Fla.1977), cert. denied, 441 U.S. 956 (1979), and must decide whether the penalty is excessive or disproportionate compared to similar cases, Ala.Code § 13A-5-53(b)(3) (1994); Williams v. State, 437 So.2d 133 (Fla.1983), cert. denied, 466 U.S. 909 (1984).
". . . .
"We have held Florida's capital sentencing statute to be constitutional. See Proffitt v. Florida, [428 U.S. 242 (1976)]; Spaziano v. Florida, [468 U.S. 447 (1984)]. In Spaziano, we addressed the specific question whether Florida could, consistent with the Constitution, vest sentencing authority in the judge and relegate the jury to an advisory role. While acknowledging that sentencing power resides with the jury in most States, we made clear that the `Eighth Amendment is not violated every time a State reaches a conclusion different *283 from a majority of its sisters over how best to administer its criminal laws.' Id., at 464. We therefore rejected the contention that `placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision.' Id., at 465; see also Walton v. Arizona, 497 U.S. 639 (1990); Clemons v. Mississippi, 494 U.S. 738, 745 (1990).
". . . .
"The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."
513 U.S. at 508-515, 115 S.Ct. 1031.
There is no reason to disturb our earlier holding affirming Tomlin's conviction and sentence to death.
APPLICATION OVERRULED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] Section 13-11-2(a)(10), read: "Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts." Sections 13-11-1 through 13-11-9, the old death penalty statutes, were subsequently repealed. A double homicide is currently defined as a capital offense punishable by death in § 13A-5-40(a)(10), Ala.Code 1975.
[2] Daniels was indicted and convicted of the murder for hire of Brune and Moore. He was sentenced to death by electrocution. His conviction was affirmed on appeal. See Daniels v. State, 534 So.2d 628 (Ala.Crim.App. 1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987). The denial of his post-conviction petition was also affirmed on appeal. See Daniels v. State, 650 So.2d 544 (Ala.Crim.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995).

The record reflects that in 1995 Daniels died of natural causes while he was incarcerated in Holman Penitentiary on Alabama's death row.
[3] In an effort to protect the anonymity of the challenged jurors we have used their initials.
[4] Section 12-16-150 states, in pertinent part:

"It is good ground for challenge of a juror by either party:
"(1) That the person has not been a resident householder or freeholder of the county for the last preceding six months.
"(2) That he is not a citizen of Alabama.
"(3) That he has been indicted within the last 12 months for felony or an offense of the same character as that with which the defendant is charged.
"(4) That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured.
"(5) That he has been convicted of a felony.
"(6) That he has an interest in the conviction or acquittal of the defendant or has made any promise or given any assurance that he will convict or acquit the defendant.
"(7) That he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.
"(8) That he is under 19 years of age.
"(9) That he is of unsound mind.
"(10) That he is a witness for the other party."
[5] Tomlin also argues that the trial court erred in restricting his questioning of this juror. However, the record reflects that the trial court did not restrict Tomlin's questioning, but merely would not allow him to ask a question that he had already asked of the juror  a question that this juror had previously answered on two separate occasions.
[6] The record reflects that this juror was Japanese; however, the prosecutor offered his reason for striking this juror.
[7] "As provided in Rule 18.4(g)(3), [Ala.] R.Crim.P., `The last person or persons struck shall be the alternate or alternates....' Thus, the trial court should view the alternate jurors as having been struck for purposes of Batson and this court must `evaluate the State's explanation for striking [the alternate].' Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala. 1993)." Ashley v. State, 651 So.2d 1096, 1099 (Ala.Crim.App.1994). We have considered the alternates as having been stuck, and our numbers reflect the alternates as strikes.
[8] This objection was based on the Supreme Court's decision in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), applying Batson to defense counsel.
[9] The contents of the letter consisted of the following:

"To: Circuit Solicitor Chs. Graddick
"On November 22, 1975, my son Paul David Tomlin was killed by a shotgun blast fired into his body. This took place while he was asleep in his bed.
"Richard Brune admitted firing the gun but claimed it to be an accident. Since there were no eyewitnesses to this terrible act [M.H.] from your office refused any further help, therefore bringing police investigation to a halt.
"I made several calls to you but you have repeatedly refused to talk to me or return my calls. You also would not talk to me when I visited your office.
"This continued neglect of your duties as public defender in my opinion is not excusable.
"It is true the boy was only 18 years of age but I think he is due some protection under our laws.
"Unless some positive action is taken by you within 5 (five) days, I shall take further action.
"Jack Tomlin
"Copies sent to:
"Governor: State of Alabama
"Crime Commission State of Alabama
"Mobile County Sheriff
"Foreman Mobile Co. Grand Jury
"Chief of Police Prichard Alabama
"Mobile Press
"W.A.L.A. Television Station
"W.U.N.I. Radio Station
"Alabama State Attorney General Office"
[10] This testimony was admitted through Tomlin's testimony that was introduced from his first trial.
[11] In relation to the three noted differences set out in our previous opinion, we note the following facts that were presented at Tomlin's fourth trial. There was testimony from James Small indicating that the shotgun wound to Moore's body was not fired from inside the vehicle. Small testified that at least two bullets were fired from the backseat of the car. Four .38 caliber bullet was recovered from Moore's body. Moore had also been shot with a .16 gauge shotgun. No particular gun was ever identified as the gun that fired the .38 caliber bullets. Small testified that the .38 caliber bullets recovered from Brune's and Moore's bodies were fired from the same gun. Danny Shanks testified that Tomlin referred to Daniels as a "hit man."
[12] Tomlin refers to this witness as "Hensarling." However, the official record certified to this Court spells this witness's name "Heasling." We have used the spelling of the witness as it appears in the record, not as it appears in Tomlin's brief to this Court.
[13] Though not argued on appeal, we note that the indictment cites the incorrect Code section. The Code section cited, § 13-11-2(10), should have actually been § 13-11-2(a)(10). "Miscitation of a code section does not void an indictment which otherwise states an offense; and, in the absence of a showing of actual prejudice to the defendant, reference to the erroneous code section will be treated as mere surplusage." Ex parte Bush, 431 So.2d 563, 564 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
[14] The trial court's explanation for refusing to accept the jury's sentence recommendation complies with the holding in Ex parte Taylor, 808 So.2d 1215 (Ala.2001), and the holding in Beck.
[15] Judges Shaw and Wise were not members of this Court when this case was orally argued. The audiotapes and videotapes of the oral argument have been made available to them.
[1] Tomlin argues that Ring was the final blow to the old death-penalty statutory scheme, under which he was convicted and sentenced, and that there is no corresponding aggravating circumstance under the old statutes for the aggravating circumstance that made the murder in this case capital  the murder of two or more people during one course of conduct.

We addressed this issue in our original opinion and will not restate our entire discussion on this issue. However, we did note that the Alabama Supreme Court in Beck v. State, 396 So.2d 645 (Ala.1980), stated that "the jury verdict that the defendant was guilty of committing the capital offense would mean that the State had already established at least one aggravating circumstance." 396 So.2d at 663.
[2] Currently, § 13A-5-45(e), provides:

"(e) At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."